## Case No. 12,248.

### The SALEM'S CARGO.

[1 Spr. 389; [1] 20 Law Rep. 669.]

District Court, D. Massachusetts. March, 1858.

CHARTER PARTY — WAIVER — GOODS SOLD AT INTERMEDIATE PORT — PENAL SUM — SHIPPING — MASTER.

1. Where a libel against the cargo was filed, to recover the balance due under a charter-party, before the cargo had been discharged from the vessel, *held*, that a previous agreement by the claimant, that such a libel should be commenced, and his assisting the officer in arresting the goods, and afterwards obtaining them, by giving stipulation, without objection, was a waiver of any right which he might have had to object to the time of instituting the suit, as premature.

[Cited in The Hyperion's Cargo, Case No. 6,987; The L. B. Snow, 15 Fed. 284; The Peer of the Realm, 19 Fed. 217; Clark v. Five Hundred and Five Thousand Feet of Lumber, 12 C. C. A. 628, 65 Fed. 242.]

2. The master of a vessel cannot vary the contract made by his employers with the charterers.

3. He has no authority, by signing bills of lading, to waive the lien of the ship-owner, on the goods of the charterer, and such bills of lading will not give a right to persons who take them, with knowledge of the charter-party, to have the goods free from the lien.

[Cited in The Eliza, Case No. 4,347; Borland v. Zittlosen, 27 Fed. 133.]

4. Where certain goods shipped abroad, were sold at an intermediate port, and the proceeds applied to the payment of freight, under the charter-party, such goods were not subject to a lien for the charter-money due, on arriving at the ultimate port of destination.

[Cited in The Hyperion's Cargo, Case No. 6,987.]

5. The lien of a ship-owner, on the goods of a charterer, is not limited by the amount of the penal sum in the charter-party.

[Cited in Watts v. Camors, 115 U. S. 361, 6 Sup. Ct. 94.]

The libel in this case was brought by the owner of the bark Salem, to recover the balance due under a charter-party. The bark was chartered in August, 1856, by Barnes, Jennings & Co., of Boston, for a voyage to one or more ports on the east coast of South America, and back to any port in the United States, except New York, at the rate of $1,200 per calendar month, payable in United States currency, or its equivalent; what the master might require in South America, to the extent of the charter earned, was payable there, the balance to be paid on return, and discharge of the cargo in the United States. The master was instructed by the owner of the vessel, to collect all the freight-money that should be due, before discharging the cargo in South America. The penal sum in the charter-party was $7,000. The vessel proceeded to Rosario, South America, with a cargo belonging to the charterers, which was there discharged, the master tak-

[1 [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

ing a guaranty from a merchant in that place, for the payment of the freight due. Subsequently, Mr. Henry Brackett, one of the firm that chartered the bark, who went out on board of her, induced the captain, by paying him $400, to give up the guaranty, and take drafts to the amount of $4,800,— the freight money then due,—drawn by said Brackett on Barnes, Jennings & Co., the charterers, the captain signing a receipt to that amount, on account of charter-party. Mr. Brackett testified that the cash was worth $800 more to him, at Rosario, than the drafts. He then purchased seven bales of horse hair, seven hundred hides, thirty-nine bales of Cordova wool, together with a few other goods, shipped them on board of the bark, for a return cargo, and proceeded to Buenos Ayres, before her. There he invested the balance of the proceeds of the outward cargo in wool, and other parties shipped goods on freight. When the bark arrived there, the master was in want of money, and the charterer was obliged to sell the seven hundred hides, and nine bales of Cordova wool, to raise funds, which were paid over to the master, on account of the charter-party. The master gave the purchasers bills of lading, agreeing to deliver the goods at Boston, for a stipulated freight. Mr. Brackett, finding it impossible to procure a cargo with his own funds, or on freight, applied to the claimants [Hugo Bunge and others], merchants in Buenos Ayres and New York, for an advance. They agreed to advance $24,000, a large part of which was to be invested in goods to be shipped by them to their house in New York, as security for the advance. For further security, it was agreed that, for the goods already purchased by the charterer, and a part of which, at least, was on board, bills of lading should be procured from the master, reciting that the goods were shipped by Daniel Gowland & Co., per order of Henry Brackett, to be delivered at Boston to order or assigns, and that such bills of lading should be indorsed to the claimants. The claimants knew of the existence of the charter-party, and refused, in consequence of difficulties which they had previously had, growing out of charter-parties, to make the advances, unless the master would sign bills of lading, agreeing to deliver the goods at a certain freight. These bills of lading were signed by the master, and indorsed by Gowland & Co., to the claimants, and the advance was made.

The drafts received by the master were never accepted or paid, and the charterers became insolvent, long before the bark returned to Boston. On her arrival there, the libellant claimed to hold the cargo to secure the payment of the whole balance due under the charter-party, amounting to nearly $9,000, and offered to discharge and deliver the cargo, on payment of that sum. The claimants refused, in any event, to pay more than

the amount due under the bills of lading, which was about $1,300. The claimants entered the goods at the custom-house, and paid the duties, and a permit to discharge the cargo was under their control. While the bark was in the charge of the revenue officers, a creditor of the charterers attempted to attach the goods, and placed a keeper on board of the bark. It was agreed between the libellant and the claimants, that, for the purposes of any suit to be brought by the former, a tender of the amount due, according to the terms of the bills of lading, should be considered as having been made. It was also agreed between them, before the libel was filed, that the inspector, with the permit, should accompany the marshal of the United States to the vessel, to give him an opportunity to arrest the goods, as soon as the hatches should be opened, and that as soon as they were arrested, they should, while in the custody of the marshal, be stored in the warehouses of the claimants, and at their expense. After the goods were arrested, the claimants obtained possession of them by stipulating in court.

At the hearing, the libellant contended that the master had no authority to sign the bills of lading which were indorsed to the claimants, and that he had a lien on the goods shipped by Gowland & Co., for the whole balance due under the charter-party, after deducting a small amount due, under the bills of lading, for the freight of goods shipped by third parties.

The claimants, among other things, contended that the master had authority to sign the bills of lading, and that they were entitled to the goods, on payment of the freight due under such bills of lading; that if the goods in question were liable for any more than that amount, the other goods shipped by the charterers at Rosario, were equally liable with them, and should pay their proportion of the charter money; that the drafts taken by the master at Rosario were received in payment, and that the lien on the goods, for the amount for which they were taken, was thereby waived; that the claim of the libellants was limited to the amount of the penal sum mentioned in the charter-party; and finally, that the libel, having been filed before the discharge of the goods, was prematurely brought, and should therefore be dismissed.

P. W. Chandler and G. O. Shattuck, for libellants.

F. C. Loring and C. F. Choate, for claimants.

SPRAGUE, District Judge. The acts and agreement of the claimants are a waiver of any objection which he might have had to the time of bringing the libel. And if there had been no waiver, it would be in the power of the court, by giving costs or otherwise, to give to the claimant a complete indemnity for all the loss or inconvenience he can sustain by the premature commencement of the suit. And it would not have been necessary to dismiss the libel, which, as the goods have now gone beyond the reach of process, would defeat the remedy against them. It is not the practice of courts of admiralty to favor formal or technical objections, to the sacrifice of substantial justice.

The taking of the drafts by the master did not in law constitute a payment. It was not shown, and it is not to be presumed, that the master intended to receive them in payment, and they had no effect upon the lien which the ship-owner might have for the amount due him.

By the charter-party, the owner of the vessel was entitled to a lien upon all the goods of the charterers, at least, if not upon those of other parties, for the payment of all that should be due to him. This was, in legal effect, a part of the contract between the owner of the vessel and the charterers. It is clear, upon principle, and well established by authority, that the master cannot change the contract made by his employers with the charterers. He could not, therefore, while at Buenos Ayres, rightfully make any agreement by which the goods of the charterer should be shipped, and not be subject to the lien for freight under the charter-party; and such agreement, if made by him, would give no rights to a person who entered into it with the knowledge of the charter-party. Nor would the master's attempt afterwards to carry such an agreement into effect, by giving a bill of lading pursuant thereto, strengthen the right of such person. It appears by the testimony of Brackett, who was a witness for the claimants, that they knew of the existence of the charter-party, and declared that they had been troubled on former occasions by charter-parties, and therefore entered into an agreement for the bills of lading, and received it for the purpose of depriving the ship-owner of his lien. If such an arrangement had been made with the libellant himself, it would have been valid, but as the master had no authority to make it, it cannot bind the libellant, or give any right to the claimants. The hides and nine bales of wool purchased at Cordova, having been sold at Buenos Ayres, and the proceeds having been applied to the payment of the freight under the charter-party, they have contributed their proportion of it, and are not now liable for the balance. The amount of the ship-owner's claim on the goods is not limited to the penal sum mentioned in the charter-party.

A decree was entered for the libellant for the full amount claimed and costs.

NOTE. Foster v. Colby. 3 Hurl. & N. 704; Kirchner v. Venus, 33 Law T. 81; Certain Logs of Mahogany [Case No. 2,559]; The Volunteer [Id. 16,991]; Ruggles v. Bucknor [Id. 12,115]; Raymond v. Tyson, 17 How. [58 U. S.] 59; Pinney v. Wells, 10 Conn. 104; The Freeman. 18 How. [59 U. S.] 182; Gilkison v. Middleton, 2 C. B. (N. S.) 134; Gracie v. Palmer,

8 Wheat. [21 U. S.] 605; Gledstanes v. Allen, 12 C. B. 202; Lamb v. Parkman [Case No. 8,020].