## WATTS *v.* CAMORS & Another.

## CAMORS & Another *v.* WATTS.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE EASTERN DISTRICT OF LOUISIANA.

Argued October 29, 1885.—Decided November 16, 1885.

In a charter-party, which describes the ship by name and as " of the burthen
of 1100 tons, or thereabouts, registered measurement," and by which the
owner agrees to receive on board, and the charterer engages to provide, " a
full and complete cargo, say about 11,500 quarters of wheat in bulk," the
statement of her registered tonnage is not a warranty or condition prece-
dent; and if her actual carrying capacity is about 11,500 quarters of wheat,
the charterer is bound to accept her, although her registered measurement
(unknown to both parties at the time of entering into the contract) is 1203
tons.

The clause in a charter-party, by which the parties mutually bind themselves,
the ship and freight, and the merchandise to be laden on board, "in the
penal sum of estimated amount of freight," to the performance of all and
every of their agreements, is not a stipulation for liquidated damages, but
a penalty to secure the payment of the amount of damage that either party
may actually suffer from any breach of the contract; and is to be so treated
in a court of admiralty of the United States, whatever may be the rule in
the courts of the particular State in which the contract is made and the
court of admiralty sits.

Under a charter-party which allowed fifteen lay days for loading after the ship
was ready to receive cargo, the owner tendered her to the charterers, they
immediately refused to accept her, and thirty-six days afterwards he ob-
tained another cargo, but negotiations were pending between the parties for
half of that time, and the owner sustained substantial damage in a certain
amount by the failure of the charterers to comply with their contract. The
Circuit Court found these facts, and entered a decree against the charterers
for that amount : *Held,* no error in law, for which the charterers could have
the decree reversed in this court.

This was a libel in admiralty by a citizen of London in the
Kingdom of Great Britain, owner of the steamship Highbury,
against two citizens of New Orleans in the State of Louisiana,
upon a charter-party the terms of which were as follows :

" This charter-party, made and concluded upon in the city
of New Orleans, La., the 7th day of August, 1879, between A.

B. French & Co., agents for the owners of Steamship High-bury, of the burthen of 1100 tons, or thereabouts, registered measurement, now due here between 10th and 20th of September, of the first part, and J. B. Camors & Co., of the second part, witnesseth: That the said party of the first part agrees in the freightening and chartering of the whole of the said vessel (with the exception of the cabin and necessary room for the crew and storage of provisions, sails, and cables) unto said party of the second part for a voyage from New Orleans to Havre, St. Nazaire, Antwerp, Bordeaux or Bremen, [for] orders, on signing bills-of lading, on the terms following: The said vessel shall be tight, staunch, strong, and in every way fitted for such a voyage, and receive on board during the aforesaid voyage the merchandise hereinafter mentioned.

"The said party of the second part doth engage to provide and furnish to the said vessel a full and complete cargo, say, about 11,500 quarters of wheat in bulk, and pay to the said party of the first part, or agent, for the use of the said vessel during the voyage aforesaid, seven shillings and six pence per quarter of 480 pounds weight delivered in full, payable in cash on right delivery of the cargo.

"It is agreed that the lay days for loading and discharging shall be as follows, (if not sooner dispatched,) commencing from the time the vessel is ready to receive or discharge cargo: Fifteen running days (Sundays excepted) for loading and discharging, lay days to commence when the captain reports the vessel is ready for cargo; and that for each and every day's detention by default of said party of the second part, or agent, fifty pounds sterling per day, day by day, shall be paid by said party of the second part, or agent, to the said party of the first part, or agent.

"The cargo or cargoes to be received and delivered within the fifteen days above specified, the dangers of the sea and navigation of every nature and kind always mutually excepted.

"To the true and faithful performance of all and every of the foregoing agreements we, the said parties, do hereby bind ourselves, our heirs, executors, administrators and assigns, and also the said vessel, freight, tackle and appurtenances, and the

merchandise to be laden on board, each to the other, in the penal sum of estimated amount of freight."

The District Court dismissed the libel, and the libellant appealed to the Circuit Court, which found the following facts:

The charter-party was executed at New Orleans on August 7, 1879, by the libellant, through his agents A. B. French & Co., and by the respondents. The libellant complied in all things with his contract. The Highbury arrived at the port of New Orleans on or before September 11. On that day, she being in that port and ready to receive cargo, her master notified that fact to the respondents, tendered her to them, and demanded of them a full cargo of wheat in bulk, according to the terms of the charter-party. On the next day, the respondents in writing refused to accept the ship, or to furnish the cargo, for the reason that her tonnage was greater than that expressed in the charter-party. Thereafter, during the lay days, various negotiations were pending between the parties, until September 30, when the master caused public protest to be made before a notary and witnesses of the respondents' refusal. On October 19, the master obtained at the same port a full cargo of cotton and oil cake, the freight of which exceeded in value by $532.10 that of the cargo of wheat which the respondents had contracted to furnish.

The actual tonnage of the Highbury was 1203 tons, registered measurement. Her actual carrying capacity for grain was about 11,500 quarters of wheat, depending upon the length of voyage between coaling stations. The estimated amount of freight, the penalty stipulated in the charter-party, was $20,872.50.

At the date of the charter-party, the Highbury was a new ship, and neither of the contracting parties in New Orleans knew her exact registered measurement or tonnage or carrying capacity. All the negotiations between them, preliminary to the contract, were with reference to her carrying capacity, which, under the custom among merchants and shippers of grain, might run not exceeding ten per cent. over or under the cargo stipulated for.

By reason of the respondents' failure to accept the ship,

furnish a cargo, and comply with their contract, the libellant suffered damages to the amount of $5693.15 (consisting of $611.15 for expenses incurred in fitting up the Highbury to receive a cargo of wheat; and $5082 for the delay, after the expiration of the fifteen lay days, of twenty-one days, at the rate of £50 a day, in obtaining and loading another cargo), with interest from the date of the libel.

The Circuit Court stated, as conclusions of law, that the libel should be maintained, and the libellant recover from the respondents the sum of $5693.15, with interest and costs, and entered a decree accordingly; and each party appealed to this court. The opinion of the Circuit Court upon the merits is reported in 10 Fed. Rep. 145.

*Mr. J. R. Beckwith*, for Watts, argued upon the construction of the contract of charter, and also as to the amount of the damages. On the latter point he said: The court erred in not decreeing the full sum of $28,872.50. This charter-party was made in Louisiana, the ship was loaded there, and the law of Louisiana is part of the contract. This is the rule both at common and civil law. *Chase* v. *Alliance Ins. Co.*, 9 Allen, 311; *Haviland* v. *Halstead*, 34 N. Y. 643; *Mather* v. *Bush*, 16 Johns. 233; *Thompson* v. *Ketcham*, 8 Johns. 189; *Jewell* v. *Wright*, 30 N. Y. 259; *Cox* v. *United States*, 6 Pet. 172; *Lanusse* v. *Barker*, 3 Wheat. 101; *Davis* v. *Garr*, 2 Seld. 124; *Curtis* v. *Leavitt*, 15 N. Y. 1, 227. If this contract had been executed, neither vessel nor cargo would at any time during performance have passed from the dominion of the civil law. The laws of Louisiana governed it. The following article from the Code relates to the interpretation of contracts: "Art. 1945. Legal agreements, having the effect of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules: 1st. That no general or special legislative act can be so construed as to avoid or modify a legal contract previously made. 2d. That courts are bound to give legal effect to all such contracts, according to the true intent of all parties. 3d. That the intent is to be determined by the words of the contract when these

are clear and explicit, and lead to no absurd consequences." The character and effect of a penal clause in contracts is regulated by several articles. " A penal clause is a secondary obligation, entered into for the purpose of enforcing the performance of a primary obligation." Art. 2117. It supposes two distinct contracts : one to do or give a particular thing : the other to do or give something in the event that the principal agreement is not carried into effect. Art. 2118. The penalty is due only on condition that the primary agreement is not performed. Art. 2119. The creditor may elect whether he will sue for the penalty or for the performance of the principal obligation. Art. 2124. The penal clause is compensation for damages. The creditor cannot demand both the penalty and the principal obligation. Art. 2125. Courts are given power to modify the penalty only when the principal obligation has been partly executed. Articles 2117 to 2129 inclusive. Thus we are free in this case from the subtlety of the common law as to penalties and liquidated damages. Partial performance—the only condition that could vest the courts with power to modify the penalty—is negatived by the pleadings and findings. In Louisiana penalty is liquidated damages whenever there has been absolute default on the principal obligation. *Barrow* v. *Bloom*, 18 La. Ann. 276 ; *Hunt* v. *Zuntz*, 28 La. Ann. 500.

*Mr. J. Ward Gurley, Jr.*, for Camors & Another.—The tonnage of a vessel is an essential part of its description. Name and tonnage are the two most distinctive parts of the description. There are often many vessels of the same nationality and name : but it is scarcely probable that two would be found of the same name and identical tonnage. The tonnage is fixed by official measurement, is part of the official record of the vessel, and is indispensable to it.

This charter-party describes the vessel as of the burthen of 1100 tons, or thereabouts, registered measurement, and the charterers engage to provide and furnish the vessel a full and complete cargo, say, about 11,500 quarters of wheat in bulk. As a vessel of 1100 tons cannot carry over 9500 to 10,000

quarters of wheat, the obligation of the charter-party and the object and purpose of the parties clearly was that a vessel of 1100 tons should be filled with wheat in bulk, not that charterers should furnish 11,500 quarters of wheat, and that a vessel capable of carrying that quantity should be furnished. With respect to statements, in a contract, descriptive of the subject-matter of it, the doctrine is that if such descriptive statement was intended to be a substantive part of the contract it is to be regarded as a warranty, that is to say, a condition, on the failure or non-performance of which the other party may, if he be so minded, repudiate the contract *in toto*, and be so relieved from performing his part of it, provided it has not been partially executed in his favor.   Maclachlan, Law of Merchant Shipping, 343.   A court must be influenced in the construction, not only by the language of the instrument, but also by the circumstances under which and the purposes for which the charter-party was entered into.   Evidence of the usages of the trade in which the vessel is to be used is admissible.   2 Phillipps Ev. 415.   In this case the charter-party expresses the object of the chartering and the particular trade and cargo contemplated, viz.: "For a voyage from New Orleans to Havre, St. Nazaire, Antwerp, Bordeaux, or Bremen, orders on signing bills of lading  .  .  .  wheat in bulk."   The usages of that trade are well known and undisputed.   When a vessel is so chartered it is for the purpose of filling a contract for the sale of American wheat and its delivery on the other side.   The invariable requirements of the custom and usages governing such transactions are that the wheat delivered must be a full and complete cargo for the vessel transporting the same, and that the cargo must not vary more than 10 per cent. either over or under the quantity named in the contract of sale.   Any deviation from these rules warrants the purchaser of the wheat in rejecting the tender and claiming damages.   Owners failed to tender a vessel of 1100 tons "registered measurement," and instead tendered a vessel of 1203 tons "registered measurement," with a much greater carrying capacity than a vessel of 1100 tons, and demanded therefor a full cargo of wheat in bulk.   Charterers and their assigns, Gordon & Gomila, there-

fore rejected the tender, and Gordon & Gomila were compelled, because of the failure of the owners to furnish a vessel of 1100 tons, to charter another vessel, the Ber Vorleck, at a higher rate, to fulfil their contract to deliver a cargo of not less than 8000 nor more than 10,000 quarters of wheat, and for which purpose they had taken from Camors & Co., the said charter-party.

Mr. Gurley also contended that the penal clause in the charter-party should be construed as a penalty and not as liquidated damages; and that being a maritime contract, its construction was not affected by the local law of Louisiana.

Mr. Justice Gray delivered the opinion of the court. He stated the facts in the language reported above, and continued:

In this case, as brought before us by the appeal and the cross-appeal, three questions have been argued, which may naturally and conveniently be considered in the following order:

1st. Is the statement of the registered tonnage of the Highbury in the charter-party a warranty or condition precedent?

2d. If it is not, is the owner of the ship entitled to recover the estimated amount of freight, that is to say, the sum of $20,872.50, as liquidated damages?

3d. If both these questions are answered in the negative, have the charterers shown any error in law in the amount of damages for which a decree was rendered against them in the Circuit Court?

1. In the charter-party, the ship is described as the "Steamship Highbury, of the burthen of 1100 tons, or thereabouts, registered measurement;" and the owner agrees to receive on board, and the charterer engages to provide, "a full and complete cargo, say, about 11,500 quarters of wheat in bulk." In fact, her registered tonnage was 1203 tons, a little more than nine per cent. above that stated in the charter; but this was not known to either party at the time of entering into the contract, and her actual carrying capacity corresponded to the cargo which the charterers engaged to furnish, and the owner agreed to receive on board.

The statement in the charter-party, concerning the registered tonnage of the ship, clearly does not constitute a warranty or condition precedent that she is of 1100 tons registered measurement. The intention and the agreement of the parties, as apparent upon the face of their written contract, were that the steamship Highbury should receive and carry a full and complete cargo of about 11,500 quarters of wheat in bulk. There being no wilful or fraudulent misrepresentation, the description, " of the burthen of 1100 tons, or thereabouts, registered measurement " (if it could under other circumstances be held a warranty), is controlled by the designation of the ship by name, and by the unequivocal stipulations regarding the cargo to be carried. *Brawley* v. *United States*, 96 U. S. 168; *Norrington* v. *Wright*, 115 U. S. 188, 204; *Barker* v. *Windle*, 6 E. & B. 675; *Ashburner* v. *Balchen*, 7 N. Y. 262; *Morris* v. *Levison*, 1 C. P. D. 155. The refusal of the charterers to accept her cannot therefore be justified.

2. The concluding clause of the charter-party, by which " to the true and faithful performance of all and every of the foregoing agreements " the parties bind themselves, their heirs, executors, administrators and assigns, and also the vessel and freight; and the merchandise to be laden on board, each to the other, "in the penal sum of estimated amount of freight," is clearly not a stipulation for liquidated damages, but a penalty to secure the payment of the amount of damage that either party may actually suffer from any breach of the contract.

The principal object of this clause appears to be to pledge the ship and freight as security for the performance of the agreements of the owner, on the one hand; and the merchandise to be laden on board, as security for the performance of the agreements of the charterer, on the other. It is in the form of a penalty; it covers alike an entire refusal to perform the contract, and a failure to perform it in any particular, however slight; and for any breach, whether total or partial, a just compensation can be estimated in damages.

At the common law, indeed, before the statute of 8 & 9 W. III. ch. 11, § 8, judgment might have been rendered for the full amount of the penalty. But in a case like this, a court of

equity would stay proceedings at law, upon payment of the damages actually suffered. *Clark* v. *Barnard*, 108 U. S. 436, 453 & *seq.; Sloman* v. *Walter*, 1 Bro. Ch. 418.; *In re Newman*, 4 Ch. D. 724. And at the present day, even a court of law would regard such a clause in such a contract as a penalty only, and not as liquidating the damages. *Tayloe* v. *Sandiford*, 7 Wheat. 13; *Van Buren* v. *Digges*, 11 How. 461, 477; *Higginson* v. *Weld*, 14 Gray, 165; *Harrison* v. *Wright*, 13 East, 343.

In Abbott on Shipping (Shee's ed.) pt. 4, ch. 2, § 2, speaking of charter-parties, it is said that " it is usual for each of the parties to these contracts to bind himself, his heirs, executors and administrators, and the owner or master to bind the ship and her freight, and the merchant the cargo to be laden, in a pecuniary penalty for the true performance of their respective covenants ; this is commonly done by a clause at the end of the instrument. Such a clause is not the absolute limit of damages on either side ; the party may, if he thinks fit, ground his action upon the other clauses or covenants, and may in such action recover damages beyond the amount of the penalty, if in justice they shall be found to exceed it. On the other hand, if the party sue on such a penal clause, he cannot in effect recover more than the damage actually sustained."

In such cases, accordingly, the courts of the United States, sitting in admiralty, award the damages actually suffered, whether they exceed or fall short of the amount of the penalty. *The Salem's Cargo*, 1 Sprague, 389 ; *The Marcella*, 1 Woods, 302. In England and in this country, a court of admiralty, within the scope of its powers, acts upon equitable principles ; and when the facts before it, in a matter within its jurisdiction, are such that a court of equity would relieve, and a court of law could not, it is the duty of the court of admiralty to grant relief. *The Juliana*, 2 Dodson, 504, 521 ; *The Harriett*, 1 W. Rob. 182, 192 ; *The Virgin*, 8 Pet. 538, 550 ; *Brown* v. *Lull*, 2 Sumner, 443 ; *Hall* v. *Hurlbert*, Taney, 589, 600 ; *Richmond* v. *New Bedford Cordage Co.*, 2 Lowell, 315.

The provisions of the Civil Code of Louisiana, and the decisions of her Supreme Court, tend to show that in the courts of that State, in case of a total breach of the contract by one

party, the other might have judgment for the full amount of the penalty stipulated by the parties, although for a partial breach he could only recover his actual damages. Louisiana Civil Code of 1870, Arts. 1945, 2117, 2124, 2125, 2127; *M'Nair* v. *Thompson*, 5 Martin La. 525, 563, 564; *English* v. *Latham*, 3 Martin La. (N. S.) 88; *Welsh* v. *Thorn*, 16 Louisiana, 188, 196; *Barrow* v. *Bloom*, 18 La. Ann. 276.

But the law of Louisiana does not govern this question, whether it is treated as a question of construction of the contract of the parties or as a question of judicial remedy

If it is considered as depending upon the intent of the parties as manifested by their written contract, the performance of that contract is to be regulated by the law which they must be presumed to have had in view when they executed it. *Wayman* v. *Southard*, 10 Wheat. 1, 48; *Pritchard* v. *Norton*, 106 U. S. 124. Americans and Englishmen, entering into a charter-party of an English ship for an ocean voyage, must be presumed to look to the general maritime law of the two countries, and not to the local law of the State in which the contract is signed.

If it is considered as a question of the remedy and relief to be judicially administered, the equity and admiralty jurisdiction of the courts of the United States, under the national Constitution and laws, is uniform throughout the Union, and cannot be limited in its extent, or controlled in its exercise, by the laws of the several States. *United States* v. *Howland*, 4 Wheat. 108; *Livingston* v. *Story*, 9 Pet. 632; *Russell* v. *Southard*, 12 How. 139; *Neves* v. *Scott*, 13 How. 268; *The Chusan*, 2 Story, 455; *The St. Lawrence*, 1 Black, 522; *The Lottawanna*, 21 Wall. 558; Rev. Stat. §§ 913, 914.

The Circuit Court, therefore, rightly held that the charterers were liable only for the amount of damages which their breach of the contract had actually caused to the owner of the ship.

3. It is contended, in behalf of the charterers, that as the ship was tendered on September 11, and refused in writing on the next day, it was the duty of the master and the owner at once to seek another cargo, and thus prevent any damage that might follow, instead of lying idle until the lay days had ex-

pired; and therefore, within the rule laid down in *Warren* v. *Stoddard*, 105 U. S. 224, no damages should have been decreed.

But the Circuit Court having found, as facts, that various negotiations were pending between the parties, after the first refusal until September 30, and that it was by reason of the failure of the charterers to accept the ship, furnish a cargo, and comply with their contract, that the owner suffered damages to the amount decreed; no error in law is shown in the decree; and it is not open to revision by this court in matter of fact. Act of February 16, 1875, ch. 77, § 1, 18 Stat. 315; *The Abbotsford,* 98 U. S. 440; *The Francis Wright,* 105 U. S. 381; *The Connemara,* 108 U. S. 352.

*Decree affirmed.*