DAMPSKIBS AKTIESELSKABET JAN v. CARGO OF JUTE BUTTS, BUR-
LAP AND/OR SHELLAC, ·Etc. (MENTE et al., claimants). ,

ANDERSON v. MENTE et al.

(District Court, S. D. New York. October 1, 1923.)

1. Shipping ☞39—If identification fair, wide margin allowed in description.
     In the absence of bad faith or grossly misleading statements, if the
     identification of the vessel in a charter party is fair, a wide margin may
     be allowed in description.

2. Shipping ☞39—Charter party construed as to cargo and freight.
     Charter party providing for furnishing of full and complete cargo, "not
     exceeding what she can reasonably stow," etc., held to mean that vessel
     should be loaded with a full cargo, less space required for necessary
     coal, freight to be determined by number of tons of cargo carried, and
     that capacity of vessel should fairly resemble identification mentioned
     in descriptive clause.

3. Shipping ☞39—Charterer held to have complied with requirements ·as to
   capacity.
     Charterer held to have met requirements of charter in regard to capac-
     ity.

4. Shipping ☞58(2)—Presumed that everything shipped was for account of
   persons having ship for voyage.
     There is presumption that everything shipped on ship under charter
     was for account of those who had entire ship for voyage, and they are
     liable for freight.

In Admiralty. Libel by the Dampskibs Aktieselskabet Jan against
a cargo of jute butts, burlap, and/or shellac, etc., Eugene W. Mente
and Emanuel V. Benjamin, doing business as Mente & Co., claimants,
in which the Central Transportation Company and another were im-
pleaded. Libel 'in personam by Frederick W. Anderson against· Eu-
gene W. Mente and Emanuel V. Benjamin, doing business under the
name of Mente & Co., in which the Dampskibs Aktieselskabet Jan
and others were impleaded. Decree for Anderson.

Haight, Smith, Griffin & Deming, of New York City (Clarence
Bishop Smith, of New York City, of counsel), for libelant, owner
of the Jan.

Poore & Webster, of New York City (James C. Webster, of New
York City, of counsel), for libelant Anderson.

Bigham, Englar & Jones, of New York City (George S. Brengle,
of New York City, and Martin P. Detels, of Brooklyn, N. Y., of
counsel), for Mente & Co.

GODDARD, District Judge. On April 6, 1917, the owners of the
Norwegian steamship Jan, then building in Shanghai, entered into a
written charter (herein called the "original charter") of the Jan to
National Coal & Trading Company, a New York corporation. The
material part of the first paragraph of this original charter read as
follows:

"This charter party, made and concluded upon in the city of New York the
6th day of April, 1917, between David C. Reid, * * * agents for owners
of the good Norwegian screw steamship Jan, * * * of about 110,000 cubic

feet grain capacity and 2,050 tons deadweight capacity (cargo and bunkers, including stores not exceeding 50 tons) on Lloyd's summer freeboard, inclusive of permanent bunkers, which are of the capacity of about * * * tons of coal, now building at Shanghai, and National Coal & Trading Company, charterers, of the city of New York."

The original charter gave the charterer liberty to subcharter and provided in paragraph 18 as follows:

"That the owners shall have a lien upon all cargoes, and all subfreights for any amounts due under this charter, and the charterers to have a lien on the ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once."

Mr. Frederick W. Anderson owned all the stock of the National Coal & Trading Company, and the National Coal & Trading Company owned 80 per cent. of the stock of the Central Transportation Company. The National Coal & Trading Company directed the Central Transportation Company, as its agent, to charter the Jan to Mente & Co., which was done by the charter dated May 10, 1917. The first, second, and fourth paragraphs of this subcharter read as follows:

"This charter party, made and concluded upon in the city of New York, this 10th day of May, 1917, between the Central Transportation Company, of Portland, Maine, chartered owners of the Norwegian steamer Jan, of about 2,050 tons deadweight 100 A1 (hereinafter called the owners), of a carrying capacity of about 102,000 cubic feet bale space and about 110,000 cubic feet grain space, now in course of construction at Shanghai, and Messrs. Mente & Co. of New York (hereinafter called the shippers),

"Witnesseth: That the said owners agree on the freighting and chartering of the said vessel (with the exception of the cabin and necessary room for the crew, and the storage of provisions, sails, fuel, and cables), or sufficient room for the cargo hereinafter mentioned, unto said shippers for a voyage from Calcutta to New York or so near thereunto as she may safely get and there deliver her cargo on the terms following: * * *

"The said party of the second part doth engage to provide and furnish to said vessel a full and complete cargo of lawful merchandise to consist of jute and jute butts, burlap, and/or shellac, in customary bales, and cases and/or bags, not exceeding what she can reasonably stow and carry above her tackle and apparel, provisions and furnishes, and being so loaded shall forthwith proceed via the Cape of Good Hope or the Panama Canal at owners' option to New York and there deliver her cargo always afloat in the customary manner."

The subcharter freight was 245 shillings per ton of 40 cubic feet, or 2,240 pounds, owner's option, to be prepaid in New York on the signing of the bills of lading. The Jan arrived in Calcutta early in August, 1917, and discharged some cargo, which the National Coal & Trading Company had shipped on her from Shanghai to Calcutta.

The Central Transportation Company's Calcutta agents, Cox's Shipping Agency, Limited, then partitioned off approximately 13,000 cubic feet of space in the fore hold of the ship to carry additional bunker coal. This space, together with the ship's permanent bunkers (which held only 65 tons, or enough for three or four days' sailing) and the bridge 'tween decks, which were listed on the builder's plan as "bunkers," were filled with bunker coal for the voyage. Cox's Shipping Agency, Limited, had the vessel measurements taken, and found that the holds had a bale capacity of 84,734 cubic feet, of which 13,000 cubic feet were used for bunkers as mentioned above, claiming there

was left only a balance of 71,734 cubic feet of bale space. Mente & Co.'s claim is that, instead of procuring the 102,000 cubic bale feet of cargo carrying space which they allege was represented and warranted in the subcharter, they would secure, they actually received only 71,734 cubic feet of bale space, or 30 per cent. less than the amount to which they were entitled. The actual amount of cargo alleged by Mente & Co. to have been shipped by them on the Jan (all in bales) was 1,458 cubic tons, 23 cubic feet, and 4 cubic inches, which, at the agreed charter rate of 245 shillings per ton, amounted to $85,-015.98. Of this amount, it is admitted $25,000 was paid by Mente & Co. to the Central Transportation Company on August 8, 1917, a further $25,000 on August 18, 1917, and a further $10,000 on September 8, 1917. The remaining $25,015.98 has not been paid, Mente & Co. claiming that the damages sustained by them, because of the higher freight rates which they were compelled to pay for the transportation to this country of the cargo which was shut out from the Jan, amounted to more than this amount.

Although $60,000 was paid by Mente & Co. to the Central Transportation Company under the subcharter, only $26,594. (the first month's hire) was paid by Mr. Anderson and his companies to the owners of the Jan under the original charter. Accordingly, under date of October 15, 1917, the attorneys for the owners of the Jan wrote to Mente & Co. as follows:

"On behalf of the owners, we give you formal notice that the owners assert a lien on all moneys due from you to the Central Transportation Company, or the National Coal & Trading Company, for carrying your cargo on the said steamship, and that in making any payments to the Central Transportation Company, or the National Coal & Trading Company, you must deduct a sum equivalent to £16,143.15s, and interest, as above stated, so that the lien of owners may be preserved."

This was the first notice Mente & Co. received to the effect that the owners of the Jan asserted a lien under the original charter. This notice was received after Mente & Co. had paid $60,000 to the Central Transportation Company, and after they had refused to pay the remaining $25,015.98.

The cargo was libeled by the owners of the Jan on the vessel's arrival in New York. Mente & Co. appeared as claimants and filed a bond in the sum of $80,000 to secure its release. The Central Transportation Company and the National Coal & Trading Company were impleaded by petition, appeared, and filed answers, both to the petition and the original libel. Central Transportation Company, however, refused to unload the cargo. Mente & Co. were accordingly required to pay the stevedoring charges on the discharge of the cargo from the ship. The Jan arrived in New York on November 6, 1917.

The rights of the Central Transportation Company were assigned to Anderson, who subsequently brought a libel in personam against Mente & Co. for $30,846.98. $25,015.98 of this amount was for the unpaid balance of freight on the cargo shipped by Mente & Co. on the Jan, and $5,831 was for freight on 100 tons of myrabolam nuts, which it was alleged Mente & Co. had shipped or caused to be shipped on the vessel. Mente & Co. appeared in the action and impleaded

the owners of the Jan, Central Transportation Company, and National Coal & Trading Company.

At the trial, the owners of the Jan called as witnesses two naval engineers, both well known as expert surveyors, Mr. Robert S. Haight and Mr. Charles E. Ross. Mr. Haight testified that the fore hold of the Jan had 53,970 cubic feet grain measure and 49,700 cubic feet bale measure; the after hold 38,780 feet grain measure and 35,170 feet bale measure; the bridge deck space 10,760 feet grain measure and 94,340 feet bale measure. This made a total of 103,510 feet grain measure and 94,340 feet bale measure. He also measured the forecastle storeroom and the poop storeroom, which had, respectively, 840 and 670 feet of bale space; but he stated that he treated them separately and gave a separate total, because the storeroom space was sometimes treated as cargo space and sometimes not, depending upon the agreement of the parties. He said that the bridge deck was considered cargo space, and this testimony was uncontradicted. Mr. Ross testified that, exclusive of storerooms, the Jan's grain capacity was 104,446 cubic feet, and, including storerooms, 106,326 cubic feet.

Both Mr. Haight and Mr. Ross, as did Mr. David C. Reid, a shipbroker called by Mente & Co., on cross-examination, stated that 'tween deck bridge space was considered cargo space. The builder's plan of the Jan shows in the fore hold and after hold, including the hatches, a total of 87,900 feet. In the plan of the steamship the bridge space is put down as 218 tons; the bridge space being so constructed that it could be used either for cargo or for coal. Mr. Haight measured this space as 9,470 cubic feet of bale space, which, added to the 87,900 given by the plan, shows a total of 97,370 cubic feet bale space.

To make the long voyage from Durban to Barbadoes it was necessary to use for coal all of the bridge space, 9,470 feet, and 11,518 feet taken out of the forward hold, so there were actually available for cargo 76,362 cubic feet of bale space. Fraudulent misrepresentation is not alleged or claimed.

There is also a claim of $5,831 against Mente & Co. made by Anderson, as assignee of the Central Transportation Company, based on the fact that, in addition to the bales of jute, there was shipped from Calcutta to New York 100 tons of myrabolam nuts, which Anderson alleged Mente & Co. had shipped or caused to be shipped on the vessel, and for which Cox's Shipping Agency, Limited, had collected freight amounting to $5,831. Each party concedes that the myrabolam nuts were shipped and that this amount of freight was collected by Cox's Shipping Agency, Limited, and that Cox had acted as their agent in some matters, but denies that in this shipment of the myrabolam nuts it was acting for them.

[1] The charter party is in a quite usual form; it begins with the date and the names of the contracting parties, with the description of the vessel, this being generally known as the "descriptive" clause. Then follows the "witnesseth" clause, setting forth in numbered paragraphs the several obligations which each party assumes. The descriptive clause is obviously mainly for the identification of the vessel. In the absence of bad faith or grossly misleading statements, if the

identification is fair, a wide margin may be allowed. Morris v. Levison, L. R. 1 C. P. D. 155; Watts v. Camors, 115 U. S. 360, 6 Sup. Ct. 91, 29 L. Ed. 406; Harrison v. Micks, Lambert & Co., [1917] 1 K. B. 755; Ashburner v. Balchen, 7 N. Y. 262; Hunter v. Fry, 2 Barn. & Ald. 421.

An examination of the charter indicates that it was the purpose of the parties to set forth specifically and fully in the so-called "witnesseth" clause just what they had agreed upon, and the specific conditions and warranties each was obligated to perform, and what each intended to include as vital. The charter is carefully drawn and consists of several pages. Included in the "witnesseth" clause, among the matters agreed upon, is the following:

"That the said owners agree on the freighting and chartering of the said vessel (with the exception of the cabin and necessary room for the crew, and the storage of provisions, sails, fuel, and cables), or sufficient room for the cargo hereinafter mentioned. * * * "

Paragraph 2 of the "witnesseth" clause provides:

"The said party of the second part doth engage to provide and furnish to said vessel a full and complete cargo of lawful merchandise to consist of jute and jute butts, burlap, and/or shellac, in customary bales, and cases and/or bags. not exceeding what she can reasonably stow and carry above her tackle and apparel, provisions and furnishes. * * * "

[2] So I think the charter party meant that the vessel should be loaded by the shipper with a full cargo, less the space required for coal necessary for the voyage, the freight to be determined by the number of tons of cargo carried; also that the capacity of the vessel should fairly resemble the identification of her mentioned in the descriptive clause. That states:

"Of about 2,050 tons deadweight, of a carrying capacity of about 102,000 cubic feet bale space, and about 110,000 cubic feet grain space."

Cox's Shipping Agency, Limited, of Calcutta, bale measurements for the two holds was 84,734 feet. Mr. Haight, an expert naval engineer and surveyor, testified that the cubic bale space was 94,340, exclusive of the storerooms, which, he testified, are sometimes included in a vessel's cargo-carrying capacity, or within 7½ per cent. of the figure in the charter party, and that, including the storerooms, the bale-carrying capacity was 95,850 cubic feet, or within 6 per cent. The grain measure, exclusive of storerooms, was 103,510 cubic feet, and, inclusive of storerooms, 105,370 cubic feet. Mr. Ross, another expert naval engineer, testified that, exclusive of storerooms, her grain-carrying capacity was 104,446 cubic feet, and, inclusive of storerooms, 106,326 cubic feet.

Mr. Haight, Mr. Ross, and Mr. David C. Reid, a shipbroker called by the shipper, testified that the 'tween deck bridge space was properly part of the vessel's carrying capacity, and that the inclusion of this space in the builder's plan would not cause them to change their respective views. The builder's plan shows a total available bale space of 97,370. It seems to me that it must have been quite apparent that a vessel of 2,050 tons deadweight, or of a carrying capacity of about 102,000 cubic feet bale space, would not have all of it available for

the shipper's cargo, for this was a long voyage, and a large supply of coal was necessary, and space for it would have to be deducted.

[3] It is not denied that it was necessary, on the long voyage from Durban to Barbadoes to use 20,988 cubic feet of space for coal. I think that the charterer in regard to capacity has met its requirements.

[4] I find that Mente & Co. are liable for the freight of $5,831 on the myrabolam nuts shipped in the spaces where the larger bales of jute would not fit. The entire ship for this voyage was theirs, and there is a presumption that everything shipped was for their account, and this has not been overcome. Cox's Shipping Agency, Limited, in Calcutta, had been acting as agents for each of the parties in some matters, and apparently was more concerned in obtaining payment of their charges than determining which was entitled to the freight collected on the myrabolams. Anderson or the Central Transportation Company had never given instructions regarding them. Mente & Co. had cabled Cox that:

"The steamship Jan was to be loaded with our merchandise and they [Cox] should look out for it when it came down the river. * * * Any goods that might be sent down for the Jan would be for our account."

The communications exchanged by Anderson and Cox were few. Mente & Co. had an extensive correspondence with Cox. On August 1, 1917, Mente & Co. wrote to Cox as follows:

"We cabled you on the 24th to know if the Jan had arrived, and also authorizing you, if necessary, to alter the allotments of space cabled you some time back to suit the various shippers, at the same time requesting you to make sure every available inch of space on this steamer was utilized."

Cox did not receive this letter until after the Jan left Calcutta, but he did receive the cable containing those instructions on or about July 24th, which was almost two weeks before the vessel arrived there. After the receipt of the cable which authorized Cox to alter the allotments of space to suit the various shippers, but before the receipt of the letter, Cox wrote Mente under date of August 3, 1917—two days before the Jan arrived in Calcutta—that he had made a change in the allotments. In that letter Cox also said:

"We also do not know for whom we are working, whether for your account or the Central Transportation Company. In the meantime we have opened separate accounts, and will leave it to you to adjust any items that do not concern you with the Central Transportation Company."

Mente & Co. are entitled to deduct from the amounts due from them the sums which they paid to have the cargo unloaded in New York; this was the duty of the charterer, not the shipper. Mente & Co.'s letter of May 9, 1917, is received in evidence, with exceptions to the parties objecting.

Accordingly a decree may be entered in favor of Anderson for $30,846.98, with interest from August 13, 1917, with costs, less the sums paid by Mente & Co. for unloading the vessel in New York, with interest from the date of their payment; the amount of these payments to be determined by a reference, unless agreed upon, with a lien in favor of the owners for the amount due them, with interest from the date due, with costs.