## PACIFIC COAST CO. v. ANDERSON et al.

(Circuit Court of Appeals, Ninth Circuit. March 11, 1901.)

### No. 619.

ADMIRALTY—PARTIES—SUIT BY DONEE OF POWER TO COLLECT FREIGHTS.

A corporation chartered a vessel from the agent of the owners for a monthly hire, agreeing to pay all expenses of navigation, and to furnish a bond to secure its fulfillment of such contract. It afterwards subchartered the vessel for the carriage of coal. for which it was to receive stipulated freights. It entered into a second contract with the agent of the owners, reciting such facts, and by which, in lieu of the bond, it granted to such agent the power to collect all freights which should become due to it while the vessel was employed under the subcharter, and to apply the same in payment of the vessel's disbursements and her hire under the charter. *Held*, that such power, having been given for a valuable consideration, and to secure the payment of money, was irrevocable by the grantor, and was equivalent to an equitable assignment of the freights, and carried with it the right to the shipowners to sue the subcharterer in a court of admiralty for their recovery.

Appeal from the District Court of the United States for the Northern District of California.

For former report, see 99 Fed. 109.

It appears from the libel and the exhibits annexed thereto: That on January 4, 1898, the ship Eclipse was chartered by the owners, A. Anderson and others, through their agent, J. C. Eschen, to the Alaska-Yukon Transportation Company, a corporation, for a voyage to St. Michaels, in the territory of Alaska, for which the charterer was to pay $1,500 per month in cash, in advance monthly, and was to provide and pay for all provisions, wages of the captain, officers, and crew, and other expenses and charges appertaining to the cargoes it might put on board. It was further provided in the charter

party that five days before the vessel was ready to load the charterer should give a bond to the owners in the sum of $10,000 for the fulfillment of the charter, "and to cover any and all liens against the vessel." That on May 2, 1898, the charter party was so modified as to grant the charterer the privilege of using the vessel in the coal-carrying trade between the ports of British Columbia or Puget Sound and San Francisco, and in consideration of this privilege it was agreed that, as soon as the vessel should be ready for delivery to the charterer, the latter should furnish and deliver to J. C. Eschen, as the agent of the owners, a bond in the sum of $10,000, conditioned that the charterer should perform the conditions in the charter party as modified, and return the ship free and clear of all incumbrances and liens. That about the same date the charterer subchartered the vessel to the Pacific Coast Company, a corporation, to engage in the coal-carrying trade between Seattle and San Francisco. That between May 10 and July 30, 1898, the Eclipse carried coal from Seattle to San Francisco, and earned thereby net freight in the sum of $8,151.50. That on May 23d, after the vessel had sailed on her first voyage, and before she arrived with her first cargo of coal at San Francisco, the charterer and the Alaska-Yukon Transportation Company entered into another agreement as follows:

"Whereas, the charter party hereunto annexed was executed by J. C. Eschen upon the understanding that a good and sufficient bond in the sum of ten thousand dollars should be executed on behalf of the Alaska-Yukon Transportation Company, and delivered to him, to secure the fulfillment of the conditions of the said charter party before the said vessel should be ready to load; and whereas, on the 3d day of May, 1898, the said charter party was modified, as appears by the document hereunto annexed, so as to allow the ship chartered thereby to engage in certain trades not contemplated by the said original charter party; and whereas, the said ship has been delivered under the said charter party as modified, and the said J. C. Eschen, acting for the owners thereof, requires that the bond so agreed on shall be executed and delivered, or that other adequate means be used to protect the shipowners: Now, therefore, in consideration of the execution of the said charter party, and the amendment thereto, and of the delivery to the Alaska-Yukon Transportation Company of the said ship Eclipse, and in further consideration of the sum of one dollar paid by the said Eschen, as agent, to the said transportation company, the said Alaska-Yukon Transportation Company has agreed, and does hereby agree, that during such time as the said company shall use the said ship Eclipse in the trade referred to in the amendment to the said charter party hereunto annexed, other than the Alaska trade, the said Eschen shall be, and he is hereby, authorized to collect all freights due to the said ship, and to receipt therefor on behalf of said transportation company, and to apply the sums so collected by him to the payment of the disbursements required in the hire, management, and navigation of said vessel, and the charges for performing said services, which are hereby fixed at the sum of one per centum of the amount of freight collected by said Eschen. And the said transportation company, for the consideration aforesaid, further agrees that, before the said vessel shall be used in the Alaska trade, as provided in the said charter party, the said company shall furnish and deliver to said Eschen, as provided in the said charter party, a good and sufficient bond in the sum of ten thousand dollars, conditioned that the said transportation company shall well and truly pay the charter money therein agreed on as therein provided, and shall return the said ship at the termination of said charter party free and clear of all liens and incumbrances." The libel alleges further that the Pacific Coast Company has refused to turn over and pay to J. C. Eschen, the agent of the owners, the freight money so earned, except the sum of $1,207, and demands judgment for $6,944.50. To this libel the Pacific Coast Company, the respondent in said suit, excepted upon the ground that it appears therefrom that the right to sue for the freights is not vested in the libelants, and that the freights were not assigned to the libelants. The court overruled the exceptions. Error in so doing is assigned by the appellant.

Sidney V. Smith, for appellant.

Andros & Frank and Charles Page, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The question presented in this case is whether the facts pleaded in the libel vested in the libelants a right of suit for the freights earned under the subcharter. It is not disputed that freight to be earned is assignable either absolutely or as security, and it is admitted that the form of assignment is immaterial, that no particular form is required, and that any agreement which shows the intention of one party thereto to make a present irrevocable transfer and the assent of the other to receive it will operate in equity as an assignment if supported by a sufficient consideration. By its terms the agreement in this case was a power authorizing Eschen, as the agent of the owners, to collect the freights; and it was intended as security for the hire of the ship and protection against liens thereon. Relying upon its protection, the appellees paid certain claims against the vessel. But it is said that the power to collect the freights was revocable by the grantor thereof, for the reason that it was uncoupled with interest. It is argued that the power did not operate as an assignment, and did not accompany an assignment of the freights or of an interest therein, and that the only interest which the grantee of the power had therein was in the proceeds to be realized by its execution. What constitutes a power coupled with an interest was clearly defined by Chief Justice Marshall in the leading case of Hunt v. Rousmanier's Adm'rs, 8 Wheat. 174. 201, 5 L. Ed. 589, a case in which the owner of an interest in a vessel had upon procuring a loan thereon executed to the lender a power of attorney to sell the interest and apply the proceeds to the repayment of the loan, and had provided that upon such payment the power should end. The grantor of the power died before the power was executed. It was held that his death revoked it. This conclusion was reached upon consideration of the fact that the power of attorney contained no words of conveyance or assignment, but was a simple power to sell and convey, and would, therefore, not survive the death of him who made it. The learned chief justice proceeded to discuss the exceptions to the rule in cases of power coupled with an interest, and to define the nature of the interest which would render such a power irrevocable. But he did not assert that no powers were irrevocable by the act of the principal save those which were thus coupled with an interest. On the contrary, he clearly recognized another class of exceptions, concerning which he said:

"Where a letter of attorney forms a part of a contract, and is a security for money, or for the performance of any act which is deemed valuable, it is generally made irrevocable in terms, or, if not so, is deemed irrevocable in law. 2 Esp. N. P. 565. Although a letter of attorney depends, from its nature, on the will of the person making it, and may, in general, be recalled at his will, yet if he binds himself for a consideration in terms, or by the nature of his contract, not to change his will, the law will not permit him to change it. Rousmanier, therefore, could not, during his life, by any act of

his own, have revoked this letter of attorney. But does it retain its efficacy after death? We think it does not "

The court there distinctly announced the doctrine that a power of attorney executed upon a valuable consideration, and given as security for the performance of any act, is irrevocable, at least during the lifetime of the grantor. In 2 Kent, Comm. 644, it is said of such a power:

"But where it constitutes part of the security for money, or is necessary to give effect to such security, or where it is given for a valuable consideration, it is not revocable by the party himself, though it is necessarily revoked by his death."

Of similar import is Story, Bailm. § 209. In Walsh v. Whitcomb, 2 Esp. 565, Lord Kenyon said:

"There is a difference in cases of powers of attorney. In general, they are revocable from their nature; but there are these exceptions. · Where a power of attorney is part of a security for money, there it is not revocable."

These remarks were made in a case in which a deed of assignment accompanied the power of attorney, but the principle there announced has been applied in cases where the power of attorney was unaided by assignment or conveyance, as in Bromley v. Holland, 7 Ves. Jr. 3,—a case in which a power of attorney to receive rents was the original security for a valid annuity. In that case Lord Eldon, speaking of the power, said:

"But, where it is executed for valuable consideration, this court would not permit it to be revoked."

So in Smart v. Sandars, 5 C. B. 895, 917, Wilde, C. J., drew this conclusion from the authorities:

"The result appears to be that, where an agreement is entered into on a sufficient consideration, whereby an authority is given for the purpose of securing some benefit to the donee of the authority, such an authority is irrevocable."

In Gaussen v. Morton, 10 Barn. & C. 731, where one, who was indebted to another, in order to discharge the debt executed a power of attorney to his creditor authorizing him to sell certain lands and retain the proceeds, it was held that the power was irrevocable. In Watson v. King, 4 Camp. 272, it was held that a power of attorney given by the owner of a vessel to one to whom he was indebted authorizing him to sell such interest was a power coupled with an interest, which could not be revoked by the grantor, but which was necessarily revoked by his death. This case is not wholly in harmony with Hunt v. Rousmanier's Adm'rs, but the difference is in words, rather than in principle; the English court adopting a broader definition of a power coupled with an interest, but coinciding in the rule that such a power, while not revocable by the grantor in person, would not survive his death. American decisions sustain this doctrine, and some of them apply it to facts analogous to those in the case at bar. Hutchins v. Hebbard, 34 N. Y. 24; Farmers' & Drovers' Sav. Bank v. Kansas City Pub. Co., 3 Dill. 287, Fed. Cas. No. 4,652; Clark v. Iron Co., 26 C. C. A. 423, 81 Fed. 310; Hurley v. Bendel (Minn.) 69 N. W. 477; In re Keys' Estate, 137 Pa. 565, 20 Atl. 710; Montague v. McCarroll (Utah) 49 Pac.·

418; Manufacturing Co. v. Marsh, 91 Pa. 96; Stover v. Eycleshimer, 46 Barb. 84. It is conceded by all the authorities that in construing such an instrument as that which is involved in the present case the principal question is, what was the intention of the parties? Was it intended to transfer the title or the right of possession of the subject-matter of the power, or was it the intention that the grantor should retain them? The intention, however imperfectly expressed, if ascertainable, will be controlling. To ascertain the intention, the court will consider not only the words used, but the purpose of the instrument, and the circumstances surrounding its execution. In the case at bar the purpose of the power is clearly expressed. It was to protect the shipowners, and to furnish a substitute for the $10,000 bond, which, under the charter party, was to be given to secure to them the fulfillment of its conditions. It was pronounced by the parties "adequate means" to that end. The consideration upon which it was executed was declared to be the execution of the charter party, and its delivery, and the payment of one dollar. It stands for the security upon which the owners parted with the possession of their vessel. The freights which they were authorized to receive under its provisions were the earnings of their own property. In short, it was a power based upon a good and valuable consideration. It was intended as security, and it comes within the definition of powers not revocable during the lifetime of the grantor, which is found in the opinion in Hunt v. Rousmanier's Adm'rs, and in the other authorities above cited. To hold such an instrument revocable by the act of the grantor thereof, would be to destroy its value as security, and to defeat the plain intention which the parties thereto had in making it.

It follows from the foregoing view of the nature of the instrument which is here sued upon that the suit was properly brought in the name of the donees of the power. The absolute power to collect, receipt for, and appropriate the freights having been executed for the consideration, and under the circumstances detailed, and by a corporation for and during its lifetime, was equivalent to an equitable assignment of the freights, and it carried with it the right to sue for their recovery. The appellees are the persons who are entitled to the benefit of the suit. They are substantially and actually interested in the subject-matter of the controversy. They are the real parties in interest. The donor of the power has made no claim adverse to that of the appellees. It has not interfered in this proceeding. In Richmond v. New Bedford Copper Co., 2 Low. 315, Fed. Cas. No. 11,800, it was held that a court of admiralty resembles a court of equity, but is even more free from technical rules, and that in some respects "it has more than all the powers of a court of equity." In Watts v. Camors, 115 U. S. 353, 361, 6 Sup. Ct. 91, 94, 29 L. Ed. 406, 408, it was said that "a court of admiralty, within the scope of its powers, acts upon equitable principles; and when the facts before it in a matter within its jurisdiction are such that a court of equity would relieve and a court of law could not, it is the duty of the court of admiralty to grant relief." Courts of equity have always given effect to instruments

such as that under consideration, with a view to carrying out the actual intention of the parties thereto. If there be sufficient in the instrument to show that it was the intention to devote the fund referred to in the power to a specific purpose, and the donor of the power retained no control over it, the court will give effect to the intention thus expressed. As was said in Spain v. Hamilton's Adm'rs, 1 Wall. 604, 624, 17 L. Ed. 619, 625:

"To constitute an assignment of a debt or other chose in action, no particular form is necessary. * * * Any order, writing, or act which makes an appropriation of a fund, amounts to an equitable assignment of the fund."

The decree of the district court will be affirmed.