## AMERICAN BRAKE SHOE & FOUNDRY CO. v. NEW YORK RYS. CO.

(District Court, S. D. New York. January 16, 1922.)

1. **Taxation ⏤535—Refund of taxes illegally collected held payable to party making payment.**

Under Tax Law N. Y. (Laws 1909, c. 62), §§ 293, 296, authorizing taxes collected under an excessive assessment to be refunded to the petitioner or other person who shall have paid such tax, the purpose and object of the statute was to cause the amount to be paid back to the person who had really paid it in the first instance, regardless of whether he was petitioner in his own name for the correction of the assessment and the refund.

2. **Taxation ⏤535—Provision in order on certiorari directing refund held not to change law as to refunding tax to party paying same.**

In a final order on certiorari finding a street railroad franchise assessment excessive and directing a refund, a provision that the refund "shall be ordered and allowed to the relator," the lessor of the street railroad, was inaccurate surplusage, where the tax was not paid by lessor, and it cannot affect the provision of Tax Law N. Y. § 296, for refunding the taxes to the lessee company which paid it.

3. **Street railroads ⏤58—Appointment of single receiver for lessors and lessee does not affect rights of parties to tax refund paid receiver.**

Where the same individual had been appointed receiver for a lessee of street railways and for numerous lessor companies, as was proper to enable him to operate the systems as a unit, as had been done in the past, that fact does not affect the determination of the right of the lessee or of the lessors to a tax refund paid to the receiver, under an agreement requiring it to be separately deposited until the right thereto was determined by the court.

4. **Street railroads ⏤58—Collection of tax refund by joint receiver held not to affect rights to proceeds.**

Where the same individual was receiver for the lessors and lessee of street railways, and as such received a warrant for refund of taxes illegally collected, the right to which was in dispute between the lessors and lessee, it was immaterial in which capacity the receiver actually took physical possession of the warrant under an agreement that the proceeds were to be kept in a separate fund until the right thereto was determined by the court, and thereafter the claims of the lessee and of the lessors to that fund were presented to the court by different counsel representing interested parties.

5. **Street railroads ⏤49—Lease held to authorize lessee to collect tax refund in name of lessor.**

Where a lease of street railways authorized the lessee to use the name of the lessor in and about the business and property, and any legal proceedings or suits necessary and requisite, the lessee had the right to bring certiorari proceedings in the name of the lessor for the reduction of a tax assessment, and to receive the warrant for refund made payable to the lessor and indorse the lessor's name thereon.

6. **Street railroads ⏤58—Power of lessee to collect refunds in name of lessor held not revoked by receivership.**

The power given the lessee by a street railroad lease of collecting in the name of the lessor the refund of taxes erroneously collected is not revoked by the appointment of a receiver for the lessor, even before such receiver has elected whether to affirm the lease, since the power

⏤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was given the lessee for the very purpose of protecting it in carrying out the terms of the lease.

**7. Street railroads ⬤⟹58—Agreement under which tax refund was collected by receiver held not to affect disposition of proceeds.**

Where a tax refund was due for taxes erroneously assessed on a leased street railroad, and there was a controversy between the lessor and lessee as to which was entitled to the fund, an agreement that the receiver of both lessor and lessee should receive the warrant and deposit the proceeds, subject to determination by the court as to the rights of the parties thereto, was in effect a sort of informal interpleader, which did not change in any way the rights of the respective parties to the fund.

**8. Street railroads ⬤⟹58—Operation of lessee company held to be for account of lessors, or according as court may find.**

Where a receiver had been appointed for both the lessors and lessee of street railroads, and was operating the entire system during an extended time allowed him by the court to elect whether to affirm the leases, his operation of the lines of the several lessors was for the account of those companies, or as the court may subsequently find, according as the equities may appear.

**9. Street railroads ⬤⟹58—Proceeds of tax refund held in trust fund under mortgage.**

Where a street railroad company had issued adjustment mortgage bonds entitled to receive stipulated interest payments only from the net income of the company, with express provision it should be noncumulative, a refund to the receiver of the company of excess taxes collected during three previous years, in none of which the full amount of interest on the bonds had been paid, was not a trust fund in the hands of the receiver for payment of additional interest for those years.

In Equity. Suit by the American Brake Shoe & Foundry Company against the New York Railways Company. On motion to confirm the special master's report determining the receiver of the defendant to be entitled to a special franchise tax refund fund. Exceptions to report overruled, and report confirmed.

The following is the report of Lacombe, Special Master:

By order of this court, dated June 2, 1921, there were referred to the special master "all questions as to the ownership of [the 'special franchise tax refund fund'], or any part thereof, including the right of the receiver to have said fund paid into his general account, to be used for the general purposes of the receivership, and all issues raised by the several answers or claims [except certain questions reserved for future adjudication by the court]; said special master to hear the same and, as to such claims as he shall find sufficient in law on the face thereof, to take the proofs of the claimants and the parties hereto and to report his conclusions as to each of said claims to this court." The special master, in addition to the usual powers, was given the same power as the court itself might have to control the procedure and permit amendments.

The special master hereby makes his report as follows:

Hearings began on July 7, 1921, and were concluded and the controversy submitted on July 26, 1921. There were the following appearances: The New York Railways Company and Broadway & Seventh Avenue Railroad Company: Winthrop & Stimson, solicitors; Bronson Winthrop and G. H. Semler, of counsel. Farmers' Loan & Trust Company, as trustee under adjustment mortgage: Geller, Rolston & Blanc, solicitors; Mansfield Ferry, of counsel.

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Madeleine I. Dinsmore et al., minority stockholders of Broadway & Seventh Avenue Railroad Company: Pavey & Wells, solicitors; Frank D. Pavey, of counsel. Central Union Trust Company, as trustee under South Ferry Railroad Company first mortgage, Sixth Avenue Railroad Company, and Central Union Trust Company, as trustee under Lexington Avenue & Pavonia Ferry Railroad Company mortgage: Larkin, Rathbone & Perry solicitors; J. L. Banks, Jr., of counsel. Contract creditors' committee: Chadbourne, Hunt & Jaeckel, solicitors; William M. Chadbourne, and C. S. Smyth, of counsel. Christopher & Tenth Street Railroad Company: Harris & Harris, solicitors; Edward W. Harris, of counsel. Four per cent. bondholders' committee; Joseph P. Cotton, solicitor; L. R. Hoover, of counsel. Bondholders' committee of first consolidated mortgage fives of the Broadway & Seventh Avenue Railroad Company: Loucks, Griffin, Connet & Cullen, solicitors; Wm. Dewey Loucks, of counsel.

The questions reserved by the court for future adjudication are: (1) Claim by the Guaranty Trust Company, as trustee under the first and refunding mortgage of New York Railways Company, dated January 1, 1912; (2) claim (subordinate to the claim of the trustee under said first and refunding mortgage) by the Farmers' Loan & Trust Company, as trustee under the adjustment mortgage of New York Railways Company, dated January 1, 1912; (3) claim by Columbia Trust Company, as trustee under mortgage made by the Columbus & Ninth Avenue Railroad Company, dated August 24, 1893; and (4) claim by the Central Union Trust Company of New York, as trustee under mortgage made by the Lexington Avenue & Pavonia Ferry Railroad Company, dated August 24, 1893, and the indenture supplemental thereto.

The "Special Franchise Tax Refund Fund" originated as follows:

In the years 1912, 1913, and 1914 the railway properties of the New York Railways Company and of various other companies, which it held and operated under leases from such companies, were assessed for franchise tax, and a tax based upon each of such assessments was levied. All these taxes were paid by the New York Railways Company, the several leases requiring the lessee to pay all taxes as part of the cash consideration for the occupancy and use of the properties covered by such leases. It was thought that the amounts of assessment were excessive, and the New York Railways Company took the proper legal proceedings to obtain correction of the same, in its own name, as relator, so far as its own property was concerned. Where the property was leased, said company took proceedings in the name of the lessor as relator. The leases authorized it thus to use the lessor's name.

These proceedings were successful, the assessments being reduced by final orders of the state Supreme Court on December 29, 1917. People v. State Board Tax Com'rs, 101 Misc. Rep. 205, 167 N. Y. Supp. 550. Under the statute, upon such reduction refunds of excess tax paid should have been audited and allowed. The city authorities, however, contending that they were entitled to offset certain other claims against said refunds, neglected and refused so to do. Mandamus proceedings were thereupon instituted, and upon decision of the Court of Appeals, March 22, 1921, in Hedges v. Craig, 231 N. Y. 513, 132 N. E. 868, affirming a judgment of the Appellate Division, they were ordered to make such refunds. Thereupon warrants were drawn by the comptroller for the refund, with interest, of the several amounts of excess tax paid. In the proceeding instituted in its own name by New York Railways Company, the warrant was to its order. In the proceedings instituted in the names of the several lessor companies, the warrant was drawn in each case to the order of the relator, although the Tax Law (Laws N. Y. 1909, c. 62, § 296) provided that the excess tax should be audited and allowed to the petitioner or other person paying the tax, and New York Railways Company asked that such refunds be made to itself as the person paying the tax.

By arrangements between the parties interested, which will be hereinafter set forth, the proceeds of all these warrants have been deposited in a

separate fund, known as "special franchise tax refund fund." The several lessors and all others interested have been allowed to file claims or answers to the petition of the receiver, and all desiring so to do have been heard, or have had full opportunity to be heard, before the special master. The various items constituting said fund are set out in detail in the following summary. The interest in all cases is calculated to April 20, 1921.

I. Refunds for Franchise Taxes of New York Railways Company.

| Date of Payment. | | Principal. | Interest to April 20, 1921. | Total. |
|---|---|---|---|---|
| May | 31, 1912 | $30,468.48 | $16,247.63 | $46,716.11 |
| November | 30, 1912 | 29,468.47 | 14,827.88 | 44,296.35 |
| May | 31, 1913 | 19,197.24 | 9,085.29 | 28,282.53 |
| December | 1, 1913 | 19,197.24 | 8,504.64 | 27,701.88 |

Total refund......$146,996.87

II. Refunds for Franchise Taxes of Leased Lines Which Make No Claim to Such Refunds.

A. Refunds for Taxes of Bleecker Street & Fulton Ferry Railroad Company.

| Date of Payment. | | Principal. | Interest to April 20, 1921. | Total. |
|---|---|---|---|---|
| May | 31, 1912 | $ 438.00 | $233.57 | $ 671.57 |
| November | 30, 1912 | 438.00 | 220.39 | 658.39 |
| May | 31, 1913 | 74.92 | 35.45 | 110.37 |
| December | 1, 1913 | 74.91 | 33.19 | 108.10 |
| May | 29, 1914 | 1,359.24 | 562.16 | 1,921.40 |
| November | 30, 1914 | 1,359.24 | 520.83 | 1,880.06 |

Total refund......$5,349.89

B. Refunds for Taxes of Ft. George & Eleventh Avenue Railroad Company.

| Date of Payment. | | Principal. | Interest to April 20, 1921. | Total. |
|---|---|---|---|---|
| May | 31, 1912 | $573.52 | $305.84 | $ 879.36 |
| November | 30, 1912 | 573.52 | 288.58 | 862.10 |
| May | 31, 1913 | 405.75 | 192.02 | 597.77 |
| December | 1, 1913 | 405.75 | 179.75 | 585.50 |

Total refund......$2,924.73

C. Refunds for Taxes of Twenty-Third Street Railway Company.

| Date of Payment. | | Principal. | Interest to April 20, 1921. | Total. |
|---|---|---|---|---|
| May | 31, 1912 | $1,238.90 | $660.66 | $1,899.56 |
| November | 30, 1912 | 1,238.90 | 623.38 | 1,862.28 |
| May | 31, 1913 | 481.61 | 227.92 | 709.53 |
| December | 1, 1913 | 481.61 | 213.36 | 694.97 |

Total refund......$5,166.34

D. Refunds for Taxes of Forty-Second & Grand Street Railroad Company.

| Date of Payment. | | Principal. | Interest to April 20, 1921. | Total. |
|---|---|---|---|---|
| May | 29, 1914 | $120.23 | $49.72 | $169.95 |
| November | 30, 1914 | 120.23 | 46.07 | 166.30 |

Total refund......$336.25

III. Refunds for Franchise Taxes of Leased Lines Which Do Make Claim to Such Refunds.

A. Refunds for Taxes of Broadway & Seventh Avenue Railroad Company.

| Date of Payment. | | Principal. | Interest to April 20, 1921. | Total. |
|---|---|---|---|---|
| May | 31, 1912 | $21,117.63 | $11,261.19 | $32,378.82 |
| November | 30, 1912 | 21,117.62 | 10,625.92 | 31,743.54 |
| May | 31, 1913 | 19,916.42 | 9,425.88 | 29,342.80 |
| December | 1, 1913 | 19,916.93 | 8,823.47 | 28,740.40 |

Total refund......$122,205.56

B. Refunds for Taxes of Sixth Avenue Railroad Company.

| Date of Payment. | | Principal. | Interest to April 20, 1921. | Total. |
|---|---|---|---|---|
| May | 31, 1912 | $2,248.55 | $1,199.06 | $ 3,447.61 |
| May | 31, 1913 | 6,031.66 | 2,854.54 | 8,886.20 |
| December | 1, 1913 | 6,031.65 | 2,672.10 | 8,703.75 |
| May | 29, 1914 | 3,406.51 | 1,408.89 | 4,815.40 |
| November | 30, 1914 | 3,406.51 | 1,305.30 | 4,711.81 |

Total refund......$30,564.77

C. Refunds for Taxes of Christopher & Tenth Street Railroad Company.

| Date of Payment. | | Principal. | Interest to April 20, 1921. | Total. |
|---|---|---|---|---|
| May | 31, 1912 | $296.78 | $158.26 | $ 455.04 |
| November | 30, 1912 | 296.78 | 149.33 | 446.11 |
| May | 31, 1913 | 507.76 | 240.30 | 748.06 |
| December | 1, 1913 | 507.76 | 224.94 | 732.70 |

Total refund......$2,381.91

To all of these refunds, principal and interest, the Farmers' Loan & Trust Company makes claim as trustee under the adjustment mortgage of New York Railways Company, January 1, 1912. The grounds of such claim will be stated infra.

The claims of the several lessor roads may be first considered, since the claim of the mortgage trustee is limited to such refunds as may actually come finally to the mortgagor.

### Claims of Lessor Roads.

Three roads make such claim. The New York Railways Company receiver had expressly notified the comptroller not to pay tax refunds to any of the lessor companies, on the ground that the statute provided that it should be audited and allowed to the person paying such tax, and that none of these taxes had been paid by lessors, but all of them paid by lessees. Nevertheless, in the Broadway & Seventh Avenue Case the warrant was drawn to the order of that road, and the comptroller refused to draw one to the order of New York Railways. Mr. Hedges was receiver of both roads, but that circumstance is immaterial. What happened is precisely what would have happened if Doe had been receiver of the Broadway & Seventh Avenue, and Roe receiver of New York Railways. The comptroller was willing to deliver the warrant, as drawn, to the New York Railways receiver and did so upon receipt of his counsel. The situation then was that Receiver Roe had a warrant which he could not use because it was not drawn to his order, and Receiver Doe could not obtain the proceeds of the warrant to his order because he did not have possession of it. The proper course to be followed would be for the two receivers to enter into some arrangement whereby the warrant could be turned into money and such money deposited in some bank to the joint account of both of them. This is what was actually done; Receiver

Hedges acting in his dual capacity as receiver for each of the roads. That deposit by agreement of parties interested was subsequently transferred to this special franchise tax refund fund (which will hereinafter be called the "special fund"). In creating this fund the court specially reserved for future decision all questions as to the ownership of funds deposited therein.

In the Sixth Avenue Railroad Case the comptroller also drew a warrant to the order of that company, but did not deliver it until after the said company and the New York Railways receiver had entered into an agreement dated June 20, 1921. That agreement, after reciting that the city was prepared to pay certain refunds and that it was not yet determined by any court or other authority to whom such refunds or any part of the same belongs, provides that the parties to it will proceed to collect these refunds from the city, making all necessary applications therefor, and giving all receipts and releases as may be demanded or will appear to be necessary or proper. It further provides that the money collected from the city is to be added to the special fund subject to the terms of the order creating it, which order reserved all questions as to the ownership of the fund. Thereafter, both parties appearing before the comptroller, the warrant was delivered, was indorsed by the Sixth Avenue Railroad and its proceeds deposited in the special fund.

In the case of the Christopher & Tenth Street Railroad a like agreement was made. The refunds were, in the same way, collected from the city and deposited in the special fund.

The statute under which proceedings may be brought to obtain relief from the alleged excessive assessments of the three years 1912, 1913, and 1914, is the Tax Law (Laws 1909, c. 62). The procedure to correct illegal or erroneous assessments is governed by article 13 of that chapter. Section 293 provides: "If it shall appear upon the return to any such writ that the assessment complained of is illegal or erroneous or unequal * * * it [the court] may order a reassessment of the property of the petitioner or the correction of the assessment upon the roll, in whole or in part, in such manner as shall be in accordance with law."

It happens frequently that the tax, predicated on an original excessive assessment, has been paid before a reassessment in accordance with law is made in conformity with the decision of the court. To secure relief to the party aggrieved in such cases, it is provided in section 296, as amended by Laws 1915, c. 470, § 1, as follows: "Any tax collected or to be collected upon such illegal, erroneous or unequal assessment shall be refunded as follows: * * * 2. When a tax, or any part thereof, upon such illegal, erroneous or unequal assessments shall have been levied * * * then the common council or * * * auditing officer or officers of such city or village shall immediately after such correction audit and allow to *the petitioner or other person who shall have paid such tax* * * * and cause to be paid to such *petitioner or other person paying such tax* * * * *the amount paid by him* in excess of what the tax * * * would have been if the assessment had been as ordered, adjudged or determined by such order of the court."

This section further provides: "Application to the proper officer for the audit and allowance of such moneys must be made by the *petitioner or other person paying* such tax, * * * within three years after the entry of the final order," etc.

· The intent of these provisions is obvious. If the petitioner (that is, the person in whose name as relator the proceeding by certiorari to correct an illegal or erroneous assessment is brought) has itself paid the tax levied upon an illegal or erroneous assessment, the city authorities shall audit and allow and cause to be paid to it the amount paid by it in excess of what the tax would have been if the assessment had been proper. If, however, such tax, levied upon an erroneous assessment, shall not have been paid by the petitioner, but shall have been paid by some other person, then the city authorities shall audit and allow and cause to be paid to such other person the amount paid by him or it in excess of what the tax would have been if the assessment had been proper. Surely the specific and unambiguous language of this section 296 is susceptible of no other construction.

In the scheme of procedure provided for in the statute, all that the court has to consider is the assessment, deciding whether it is or is not illegal, or

erroneous, or unequal. If it reaches a conclusion favorable to the petitioner (relator), it merely orders a reassessment of the property or a correction of the assessment upon the roll. It has nothing to do, in the certiorari proceedings, with securing to the person entitled thereto any refund of excess taxes paid. The statute provides for that by itself imposing an obligation directly upon certain public officers. If they fail to fulfill their obligations, the person aggrieved must obtain his relief by some independent proceeding. Such was the case here; the city officers did not audit, allow or cause to be paid any refund of excess taxes paid until they were ordered to do so by the court, in mandamus proceedings.

The orders entered in each of these certiorari proceedings ordered that the assessment be reduced from the amount originally assessed to a smaller amount and that it be confirmed at such smaller amount. It further ordered and directed that the officer or officers having custody of the assessment roll or the tax roll forthwith correct the entries in conformity with the order, noting in the margin that such corrections are by authority of this order. It further ordered that costs be recovered.

There the order might well have stopped, but it contains the following additional clause: "Ordered and directed that, unless sooner paid, there shall be audited and allowed to the relator and included in the tax levy of the city of New York made next after the entry of this order, the amounts, if any, paid by said relator against the said erroneous assessment in excess of what the taxes would have been if the said assessment had been made as determined by this court, together with interest thereon from the date of said payment." Quite probably it was because of this clause that the comptroller drew his warrant in each case to the order of the relator.

This clause, however, is manifestly superfluous. The court was undertaking, in compliance with the statute, merely to correct an erroneous assessment. Such correction once made, the statute itself provided how the excess tax should be refunded. There was nothing before the court to indicate that the officers who were to prepare the next tax levy had failed, or were about to fail, to do what the statute required them to do.

Moreover, this clause does not call for the audit and allowance to the relator of excess taxes which it had not paid. The language is: "There shall be audited and allowed to the relator * * * the amounts, if any, *paid by said relator*." In none of these cases (except the tax levied on New York Railways itself) had the relator paid any tax at all.

Furthermore, even if the words "by said relator" in this clause were disregarded, so that the clause undertook to provide for audit and allowance of the excess to the relator, which did not pay the tax, instead of to the New York Railways Company, which did pay it, then such direction contravenes the specific language of the statute, and since the deliverance is found in a proceeding which was in no way concerned with audit and allowance of refund, it would be a mere dictum and not binding on any one.

The conclusion is reached that neither this superfluous clause in the order of December 29, 1917, nor the action of the city authorities in auditing and allowing each of these refunds to the respective lessors, nor the drawing of warrants to the order of such lessors, were competent to override the specific provision of the Tax Law, above quoted.

Suggestion was made, on the argument, that these several payments of taxes by the lessee were made as agent of the lessor, and that therefore it might be said that the lessor really paid them. The contention is not found persuasive. The lessee did not make these payments out of lessor's funds in its control, nor upon lessor's credit, the advance to be repaid at some later day. By the terms of the lease the lessee assumed the obligation to pay these several taxes itself, and it did pay them out of its own funds, without any recourse to the lessor for reimbursement.

There is a further contention that, even though the lessee were entitled to be paid the amount of an excess tax, its only relief would be by an action for money had and received against the lessor, and that, in such an action, the lessor would be entitled to counterclaim for any indebtedness to it of the New York Railways Company. The briefs discuss at some length the subject of counterclaim and set-off, but it seems a sufficient answer to the argu-

ment to say that the proof does not establish the major premise. In no case does it appear that the lessor "had and received" the money representing the refund. The mere signing of a warrant to its order did not transfer the money. The comptroller declined to give the warrant so drawn to the lessee independently. The money did not pass from the comptroller's treasury until both claimants had appeared and agreed that it should, on their joint account, be removed from the comptroller's treasury to this special fund under the control of the United States District Court.

Legally the situation is the same as if, two claimants insisting to the comptroller each that it should have a sum of money which that officer is willing to pay to the true owner, it is agreed by all that the money shall be paid into court and the two claimants interpleaded to satisfy the court by argument to which of them it shall be paid. That being so, the Tax Law expressly provides that it shall be paid to the person who paid the excess tax, and that is the New York Railways Company.

Claim of Farmers' Loan & Trust Company, as Trustee under Adjustment Mortgage of New York Railways Company.

This claim is against the whole amount of refunds, including those made for excess taxes on leased lines. The mortgage was made to secure the payment of principal and interest of upwards of $30,000,000 income bonds to bear noncumulative interest at the rate of 5 per centum per annum if and to the extent that the net income of the company as defined and provided to be ascertained and determined in said mortgage should suffice for such payment. The text reads: "The interest shall be noncumulative, that is to say, if the net income, as hereinafter in this section 2 of this article third defined and provided to be ascertained and determined of any calendar year, shall not be sufficient to pay such interest at the rate of 5 per cent., * * * then the deficiency, whether total or partial, shall not be payable, though there be net income in subsequent calendar years."

There are in this section 2 elaborate provisions for the ascertainment and determination of net income. For certain periods of time the board of directors shall include as a part of its membership directors elected or chosen by the bondholders. The mortgage provides that: "The net income of the company for any period for which the same is by this indenture required to be ascertained and determined shall be, and is defined to be, within the meaning and for the purposes of this indenture and of the bonds and coupons at any time outstanding hereunder, the aggregate of the gross earnings and income of the company (including therein the company's proportionate interest in the income of each auxiliary company and of every other company stock in which shall be included in the pledged securities) during such period, from the mortgaged and pledged property, less such expenditures actually made and reserves effectively set apart as shall be properly chargeable against such gross earnings and income during such period, but excluding from such deductions" certain items, which it is unnecessary to consider here.

On or before March 1st and September 1st in each year the company shall file with the trustee a summarized statement, showing the amount of gross income, expenditures and charges, and net income for the period of six months ending June 30th and December 31st then last past, and the amount accordingly payable as interest for such period. If said statement shall be filed at a time when the board shall include in its membership directors elected or chosen by the bondholders, there shall also be filed with such statement an approval in writing, signed by at least three-fourths of the members of the directorate so constituted. " * * * The said statement thus approved shall be binding and conclusive on all persons, including the company and its stockholders and all holders of bonds and coupons secured hereby."

If such written approval, so to be signed, shall not be signed by the necessary three-fourths (and in certain other contingencies which have no relevancy to this controversy), then a board of experts shall be selected. The said board of experts shall proceed, with all convenient dispatch, to ascertain and determine, in accordance with the aforesaid provisions of section 2, the net income of the property, as the same is above defined, for the period of

six months ending June 30th or December 31st next preceding the selection of such board, and the amount accordingly payable as interest on the bonds for such period, and shall file a report. "The action, decision, and report of a majority of the members of said board shall be deemed and taken to be the action, decision or report of the said board of experts, and shall be final and conclusive on the trustee, the company, and all holders of bonds hereby secured and then outstanding."

During the several periods covered by these three years, 1912, 1913, and 1914, there were representatives of the bondholders on the board of directors. All special franchise taxes paid during those periods were to their full amount deducted from gross earnings in ascertaining net income. In none of these periods was the net income sufficient to pay 5 per cent. interest on the bonds, nor would it have been sufficient, if merely the correct and true amount of such taxes had been paid.

The contention of the trustee, as stated in its answer, is that the refunds of each and all of the excess special franchise tax payments when and as received are part of the net income of New York Railways Company (as defined in the mortgage) for the respective years in which such excess payments were made, and are therefore to be accounted for to the trustee, as income distributable to the adjustment bondholders for the respective years in which such excess payments were made.

As more fully appears in the argument, the contention is that certain statements which appear as part of the "statements of earnings" (and elsewhere) constitute a "declaration under which the several, claims of New York Railways Company against the city for the refund of the special franchise taxes illegally assessed, and any amounts received by New York Railways Company as the proceeds of such claims, whether for the years 1912, 1913, and 1914, are held by New York Railways Company in trust for the Farmers' Loan & Trust Company, as trustee for the adjustment bondholders, that the claims against the city were set apart for the benefit of the bondholders, and that such refunds are applicable to the net income of New York Railways Company for the respective years 1912, 1913, and 1914, in which the excess assessments were illegally levied and the taxes illegally paid by New York Railways Company, and, upon receipt by him, are immediately distributable by the receiver to the Farmers' Loan & Trust Company, as trustee."

These several statements which it is contended declare a trust are as follows:

In the semiannual statement for the six months ending June 30, 1912, there appears a separate enumeration, as a deduction from income, of two reserves (amortization and depreciation) "imposed upon the company by order of the Public Service Commission." In connection therewith appears this statement: "Of this the amortization reserve, together with so much of the depreciation reserve as the directors should decide to be unreasonable, will be paid to the income bondholders if the order of the Public Service Commission should be reversed by the courts." An asterisk preceding these statements as to Public Service Commission reserves carries the reader to another asterisk preceding the following: "Note.—There will also be paid to the income bondholders such proportionate rebate of the special franchise taxes as assessed, now in litigation, as may result from a decision of the court."

Neither statement nor "note" indicates in what way the bondholders are to receive the benefit of these hoped-for rebates. There is no similar "note" in any other of the "semiannual statements" for 1912, 1913, and 1914, which are all in evidence.

The statement to which this note was appended, showing a balance distributable to the income bondholders of $236,368.28, was submitted to the board of directors of the New York Railways on August 28, 1920. Thereupon this action was taken:

"The chairman laid before the board of directors a summarized statement showing net income of the New York Railways Company in the amount of $236,396.28, to be available for distribution to the adjustment mortgage income bondholders for the six months ended June 30, 1912, after reserving the full amount required by orders of the Public Service Commission relating to

amortization and depreciation and setting aside a proportionate amount of the special franchise taxes for the year 1912 as actually assessed. Three-fourths of the directors representing the adjustment mortgage income bond-holders, having expressed their approval of the aforesaid sum as the sum properly distributable to the adjustment bondholders for the six months' period ended June 30th ultimo, and having signed for presentation to the trustee a statement showing the amount as aforesaid to be distributable, it was thereupon, on motion, duly seconded, resolved: That this company pay to the adjustment mortgage income bondholders for the six months ended June 30, 1912, under the terms of the adjustment mortgage dated January 1, 1912, the sum of $7.71 per $1,000 bond, payment to be made at the office of the treasurer of the company on October 1st, 1912."

Immediately following the text of this resolution the minutes contain this statement: "With reference to the foregoing resolution it was the sense of the directors that, in the event of the successful termination of the litigation now pending with respect to the orders of the Public Service Commission and special franchise taxation, from the reservations now made against the orders of the court, such amount of the depreciation reserve, made under such orders, as the directors may determine to be proper, be hereafter dis-tributed to the adjustment bondholders as additional income earned." This declaration of the sense of the directors does not indicate in what way nor at what time bondholders were to receive the benefit of these hoped-for re-bates, except that they would be "additional income earned" and would be distributed as such.

In the annual report of New York Railways for the six months ending June 30, 1912, there is a table showing income for that period, with the fol-lowing statement: "The above net income provides for the reserves imposed upon the company by order of the Public Service Commission, now in litiga-tion. Of these the amortization reserve and so much of the depreciation re-serve as the board of directors should decide to be unreasonable will be paid to the income bondholders if the order of the Public Service Commis-sion should be reversed by the courts. There will also be paid to the income bondholders such proportionate rebate of the special franchise taxes as as-sessed, now in litigation, as may result from the decision of the court." This statement does indicate in what way the hoped-for rebate will be paid to bondholders.

In the annual report for the year ending June 30, 1913, there is the fol-lowing statement: "The full amount assignable for the year's taxes has been accrued or paid. A favorable decision is anticipated on amounts in litigation, which, if received, will contribute a considerable refund to the credit of income account. By order of the Public Service Commission the company has accrued 20 per cent. of its gross operating revenues for main-tenance and a depreciation reserve fund. In case of a reversal of this order, so much of the amount as the board of directors may deem to be unreasonable will be credited to net income available for interest on the company's bonds." This statement does not indicate in what way a hoped-for refund will con-tribute "to the credit of income account."

It is to be assumed that all statements as to future benefits which the bondholders may expect to receive as the result of successful litigation or otherwise are to be construed as implying that such benefit will come to them in such way as the mortgage provides. Declarations as to the "sense of di-rectors," if construed to import something other or different from the pro-cedure provided for in the mortgage, would be of no effect.

Where properties of this sort are to pay at stated intervals amounts of money—as bonded interest or as dividends—based on the net result of opera-tions for some stated period, there is always the likelihood that errors of calculation will result. It will frequently turn out that the calculated amount of some particular item on one side or the other of the income and outgo account is greater or less than subsequent developments show that it should have been. One would expect to find provision made in the instrument itself for the correction of such errors. Such provision is found in this mortgage. It is found in article third, section 2, being the fifth paragraph beyond the paragraph which contains the statement that the interest "for and during

each calendar year shall be noncumulative; that is to say, if the net income, as hereinafter defined and provided to be ascertained, of any calendar year, * * * shall not be sufficient to pay such interest at the rate of 5 per cent. per annum for such year, then the deficiency, whether total or partial, shall not be payable, though there be net income in subsequent calendar years."

The provision precedes those already referred to as prescribing the procedure for ascertaining net income by approval of directors, or by a board of experts. It reads: "In case it shall be impracticable at the time of making an ascertainment as hereinafter provided to definitely determine the amount of any taxes, assessments, license fees, percentages on gross earnings, and other governmental or municipal charges, or any other charges properly then chargeable against, and so to be reserved out of, such gross earnings and income, then there shall be deducted from said gross earnings and income, and effectively reserved, an estimated amount based, so far as possible, on the experience of the last preceding full year's operation of the property. In case the amount actually paid on account of any such item shall be greater or less than the amount thus estimated the difference shall be deducted from or added to, as the case may be, the gross earnings and income of the succeeding period in which such payments shall have been actually made."

The draughtsman had in mind this sequence of events, confining the language of the paragraph, for the sake of brevity, to taxes and assessments, which is what we are concerned with here. At the end of a six-month period, when an ascertainment of income was to be made, there was uncertainty as to the amount of a tax or assessment; it was impracticable to determine definitely the amount thereof. For example, the property on which a tax was leviable might be assessed at $500,000. Counsel might advise that if legal proceedings were taken it would probably be reduced to $400,000, and possibly even to $300,000. The company decided to institute such proceedings to definitely determine the amount of the tax which should properly be deducted for this period. Such proceeding might consume a year or more, and meanwhile there was a present deduction which should be made for it. An estimate of what such deduction should be would then be made and that amount effectively reserved. The safest estimate to make would be one which contemplated the possibility of nonsuccess in the litigation. The amount of such estimate could be effectively reserved by depositing the money in some bank or trust company to await the decision of the court. The amount thus effectively reserved would be deducted from the gross earnings and income of the period. When decision was rendered so much of the deposit as was needed to pay the tax as finally determined would go to the tax collector, and the residue, if any, would go to the company which deposited it.

The paragraph expressly includes "taxes and assessments," the amount of which cannot, at the time, be definitely determined. It cannot be construed to exclude them merely because it provides that the "estimated amount" shall be "based so far as possible on the experience of the last preceding full year's operation of the property." That phrase is inserted because the paragraph deals, not only with taxes, assessments, and other governmental charges, but also with "any other charges properly then chargeable," but not then definitely determined in amount.

In the sequence of events above rehearsed, the full estimated amount of the tax was "effectively reserved" by deposit, and when the final decision of the court was rendered the correct amount of the tax would be paid and a surplus remain with the company. That surplus would be the "difference" between the "amount estimated" and the "amount actually paid." What shall be done with it? The paragraph answers that question in no uncertain terms. "The difference shall be * * * added to the gross earnings and income of the succeeding period in which such payments shall have actually been made."

It seems to the special master that such are the plainly expressed provisions of the paragraph; that when the amount of a tax (the amount estimated to be a proper one to reserve) is effectively reserved, and the amount of such reservation is charged against the income of the period when reservation is made, then the "difference," when it subsequently appears that the reserva-

tion exceeds the finally determined amount of the tax, shall be added, not to the income of the period in which it was reserved, but to the income of the succeeding period when the "difference" comes into being by definite ascertainment of the true amount chargeable. It is difficult to see how this paragraph, which deals with the situation created when there is an efficient reservation of the money needed to pay a tax, the correct amount of which was not determined when it fell due, can be given any different construction.

Such a construction of its provisions is in harmony with the whole instrument. It harmonizes with the provision, above quoted, which explicitly and peremptorily declares that income under this adjustment mortgage shall be "noncumulative" and gives a careful definition of that word. It harmonizes also with those other provisions, above quoted, which declare that the ascertainment of income for a particular period made, as above set forth, with approval of a specified number of directors or by action of the board of experts, "shall be final and conclusive on the trustee, the company, and all holders of bonds hereby secured and then outstanding." The special master has found nothing in the instrument which would support a finding that this "final and conclusive" action of the authorities named as to one period is at some subsequent time—it may be years afterwards—to be set aside, the calculations already approved thereby to be reopened, and the amount of the income available for payment of coupons falling due in a long prior period to be restated. It harmonizes also with the practical construction of the instrument as indicated by several of the "statements" in evidence. It will be remembered that the paragraph dealing with "differences" includes not only those arising in connection with taxes and other governmental charges, but also all other charges.

In the statement for the period ending December 31, 1914, after ascertaining the operating net income for the year, such net income is increased by this addition: "Adjustment of reserve for accident and damage claims, expenses for litigation for the six months ending June 30, 1912, being the difference between 8 per cent. and 7 per cent. of the passenger revenue of the period stated, $65,369.46." This item is explained by a note which reads as follows: "Note.—There has been transferred from the accident and damage reserve for the six months ending June 30, 1912, to the income account for the six months ended June 30, 1914, the amount above shown. This should be regarded as a basis for estimating future income, as the cost of accidents for the first six months of 1912 appears to bear a smaller ratio to the gross receipts than present estimates indicate for any subsequent period. The Workmen's Compensation Law effected July 1, 1914, has increased the accident and damage costs. Further, the company has shown a substantial decrease in gross revenue and the amount of accidents reported as increased during the last six months of 1914. Based on these facts and the past experience of the company, it is the opinion of the board of experts that 7½ per cent. of the gross passenger revenue is not an excessive amount for the accident and damage reserve for the six months under consideration."

In the statement for the six months ending June 30, 1913, there is a similar addition to net income for that period: "Adjustment of reserve for accident and damage claims and expenses and litigation for six months ended December 31, 1912, being the difference between 8 per cent. and 7¼ per cent. of the passenger revenue for the period stated, $51,056.92." And there is a similar note explaining the item: "Note: There has been transferred from the accident and damage reserve for the six months ended December 31, 1912, to the income for the six months ended June 30, 1913, the amount above shown. This should not be regarded as a basis for estimating future income as the cost of accidents for the second six months of 1912 appears to bear a smaller ratio to gross receipts than present estimates indicate for any subsequent period."

In the statement for the six months ending December 31, 1913, there is a similar addition to net income for that period: "Adjustment of reserve for injury and damage claims and expenses of litigation for the six months ending:

June 30, 1912 ...................................................... $19,918.42
December 31, 1912 ................................................ 25.899.44
June 30, 1913 ...: ................................................ 83,108.03
                                                                    _____
                                                                    $128,925.89"

This statement was signed by the five bondholders' directors.

Again; in the statement for the six months ended June 30, 1916, also signed by the bondholders' directors, there is added to the net income for the six months in question this item: "May, 1916. Proportion of refund of income tax (New York & Harlem Railroad Company) for year 1912, $4,131.21."

In the case of a tax such as those in question here, payment of the amount claimed in advance of final determination of the correct amount is quite as satisfactory an arrangement as an effective reservation would be, since the statute provides that, if the assessment be held to be erroneous and excessive, there shall be a refund by the city authorities of the excess, with interest. The draughtsman did not make any separate provision for such a payment of the amount charged instead of reservation of the same amount. One may well suppose that he did not do so because he thought that it was unnecessary—that both situations should be dealt with in the same way. It is difficult to perceive any difference in principle between an "effective reservation" of the amount and its actual payment. The amount of reservation or of payment is deducted, in each case, from the gross earnings and income for the period to ascertain by "final and conclusive" action the net income and accordant interest for such period. It would be a strained construction of the paragraph to hold that, when a "difference" resulting from judicial decision came into existence, such definite and conclusive ascertainment for the first period should stand undisturbed and the difference be carried to the calculations of a subsequent period, if the amount charged for a tax had been effectively reserved, but that, if it had been actually paid when charged, then years afterwards when the "difference" was first ascertained, such ascertainment of income should be ripped open and the difference inserted in a recalculation to be then made.

The conclusion is reached that the words at the end of the paragraph, "the succeeding period in which payments shall have been actually made," do not call for any such construction, which would make the bondholders' income cumulative in one case and noncumulative in the other. Had the New York Railways Company remained solvent until the final decree directing the audit and allowance of the claims for refund was made in March, 1921, such refund, being the "difference" referred to in the mortgage, would have been added to the gross earnings and income of that period in calculating the net income of such period, which net income would have been available for the payment of interest. But the situation has entirely changed. The adjustment mortgage being in default. the trustee on June 9, 1919, filed a bill of foreclosure, and in such suit Job E. Hedges was on July 1, 1919, appointed receiver of all the property of the mortgagor, the foreclosure suit being consolidated with an earlier creditors' bill.

There is no longer any ascertainment, for stated periods, of net income and of the amount of interest to be paid on adjustment bonds. All claims of the bondholders are to be satisfied, if at all, out of the proceeds of the sale in foreclosure. The receiver is operating the property to discharge its quasi public functions and to preserve its franchises. and all current income should be applied to the general purposes of the receivership.

The conclusion is reached that this "special franchise tax refund fund" should be paid into his general account to be so applied.

Winthrop & Stimson, of New York City (Brenson Winthrop and G. Herbert Semler, both of New York City, of counsel), for receiver of New York Railways. Co.

Loucks, Griffin, Connot & Cullen, of New York City (William H. Griffin, of New York City, of counsel), for committee representing majority of bondholders of Broadway & Seventh Avenue R. Co.

Pavey & Wells, of New York City, for minority stockholders of Broadway & Seventh Avenue R. Co.

Larkin, Rathbone & Perry, of New York City (Henry V. Poor and James L. Banks, Jr., both of New York City, of counsel), for Sixth Avenue R. Co.

Harris & Harris, of New York City (Edward W. Harris, of New York City, of counsel), for Christopher & Tenth Street R. Co.

Geller, Rolston & Blanc, of New York City (Edward H. Blanc, Mansfield Ferry, and Henry N. Flynt, all of New York City, of counsel), for Farmers' Loan & Trust Co.

Chadbourne, Hunt & Jaeckel, of New York City (William M. Chadbourne and Cyrus F. Smythe, both of New York City, of counsel), for contract creditors' committee.

MAYER, Circuit Judge. The motion is to confirm the special master's report, a copy of which is set forth above. After consideration of arguments fully presented and briefed, it is interesting to observe how completely the special master has dealt with the essential questions in a report which, in the circumstances, is both succinct and comprehensive. It is necessary only to refer to some features by way, in a sense, of supplement.

*The Case of the Lessor Companies.*—As against the lessor companies, the receiver was entitled to the refund independently of any statute. No conduct of the municipal authorities could in any manner affect the rights which existed originally between the lessor companies and the receiver. If, therefore, the New York Railways was entitled to recover back as its own the money expended for taxes illegally exacted by the public authorities, neither the action of those authorities nor any statute could transfer that money to someone not entitled thereto.

[1] The statute (Laws of 1909, c. 62) is, in fundamental essence, merely a mode of procedure. The sovereign (in this instance, the state of New York), realizing that sound governmental policy required that there should be a refund of a tax collected upon an illegal, erroneous, or unequal assessment, provided the procedure by which the wrongful tax could be collected back. This procedure is set forth in article 13 of the statute; sections 293 and 296, quoted in the opinion of the special master, being important in this connection. Under these provisions, the proper authorities were directed to audit and allow to "the petitioner or other person who shall have paid such tax, * * * and cause to be paid to such petitioner or other person paying such tax * * * the amount paid by him. * * *" The application was to be made to the proper officer by the "petitioner or other person paying such tax." Obviously the test is: "Who has paid the tax?" All the rest is procedure. The purpose and object of the statute was to cause the illegally exacted amount to be paid back to the person who had really paid the amount in the first instance in response to a collection by the public authorities based upon an illegal, erroneous, or unequal assessment.

[2] The lessor companies plainly cannot now have any greater rights than prior to the receivership, and any inaccurate language or surplusage contained in the order of the Supreme Court (as the result, doubtless, of the draft of the order by counsel) cannot, in any manner, affect

the rights of the parties. As properly said by the master, the order might well have stopped before it contained the additional clause to which he refers, containing, inter alia, the words "shall be ordered and allowed to the relator."

[3] Much is made of the physical situation imaginatively pictured at the office of the comptroller with Hedges, as receiver of the railway company, tugging at one end of the check, while Hedges, as receiver of the Broadway & Seventh Avenue Railroad Company, is tugging at the other end, and similarly Hedges, receiver, engaged in the same kind of contest with the Sixth Avenue Railroad Company, as lessor, and the Christopher & Tenth Street Railroad Company, as lessor, at the other end of their respective checks. The precedent set by Judge Lacombe in the management of the Metropolitan Street Railway receivership has been followed by this court and is in accordance with familiar practice. Here is a large and complicated system of surface railways, necessarily operated as a unit, with the same overhead, and with interchange of cars and other facilities and other common administrative interests, all to be adjusted in due course on a proper basis, legal or equitable or both, as the case may be.

Franchise rights, in most instances, are not the same as operated routes. A line with a particular name for convenient designation, such as the Broadway line, in actual operation, may be and is run over tracks and along routes covered by different franchises. To appoint one receiver under a general creditors' bill and another receiver under a foreclosure bill would necessarily have resulted in additional expense, and possibly in conflict in respect of the great number of administrative problems dealt with almost daily. When any question of law arises, as in the case at bar (and this is an important point), it is not the receiver who decides the question, but the court, and it makes no difference in such a situation whether the receiver of the railways under the general creditors' bill and the receiver of the Broadway & Seventh R. R. Company under the foreclosure bill is the same person. Had the receivers been two persons, instead of one, the court, of course, would have said, as occurred in this case:

"You must each assert your rights in the interest of the estate you represent and the court will determine your rights."

[4] The obvious and sensible method of dealing with a situation of this kind is to do what was done; i. e., to get the money in hand and then let the contest for it go forward. Unless the checks had been obtained in the manner and in the circumstances which occurred in this case, they might very well be still in the possession of the comptroller, who was acting presumably in accordance with what he deemed to be his legal duty.

It would be substituting fine and unsubstantial technical distinctions for sound administrative common sense to determine the rights of the parties by any theory as to who was entitled successfully physically to carry the checks from the comptroller's office in the circumstances above referred to. These checks are now in a special fund, subject to an order of the court which had for its purpose the preservation of the rights of all concerned.

As between the contending parties, there was an impassé, and none of the parties is entitled to any advantage over the other by any assumption as to who ultimately might have physically carried the checks away from the comptroller's office, if the very sensible arrangement which was made had not been made. Further, in order to assure full presentation, the case for the respective roads has been presented by highly competent counsel independent of the counsel for the receiver, that of the Broadway & Seventh Avenue Railroad Company by counsel for the majority bondholders and counsel for the minority stockholders, that of the Sixth Avenue Railroad Company by the counsel for that company, and that of the Christopher & Tenth Street Railroad Company by the counsel for that company.

The fundamental question in the case is: Who was entitled to receive the money in April, 1920? As to the Broadway & Seventh Avenue Railroad Company: In the lease of the Broadway & Seventh Avenue to the Houston, West Street & Pavonia Ferry (Exhibit 1), after letting and demising all the property and franchises of the lessor, the lessor covenanted that the lessee should have "the exclusive right to manage, use, and control said demised property, * * * and shall have, use, exercise and enjoy all the rights, powers, and authority of the party of the first part in that behalf" necessary, useful, or proper. The lessor further covenanted that it would "perform any and every corporate act which may be necessary, useful, or appropriate to secure to the party of the second part the full enjoyment of the demised premises." Then the lease specifically provided:

"And to enable the party of the second part [the lessee] to beneficially enjoy said rights and privileges and benefits hereunder demised, the party of the first part hereby appoints the party of the second part, its successors and assigns, its attorneys, irrevocable, with full power and right at the expense of the party of the second part to use the name of the party of the first part in and about the business and property and use of the said demised railroad, * * * and at the expense of the party of the second part to use the name and seal of the party of the first part in and about any legal proceedings and suits at law or in equity as to the party of the second part may seem necessary and requisite in carrying out the objects and intent of this identure."

[5] Thus the New York Railways had the right itself to bring the certiorari proceeding, and, if it chose to do so, to bring it in the name of the Broadway & Seventh Avenue. This it did. The New York Railways Company was the party plaintiff, using the name of the Broadway & Seventh Avenue as it had the right to do. If the proceeding had actually resulted in a money judgment for the nominal plaintiff, the New York Railways had the right to collect it and satisfy the judgment and sign the name of the Broadway & Seventh Avenue to the satisfaction piece. Similarly it would have had the right, exhibiting its lease to the comptroller, and pointing to the power of attorney, to demand to be recognized as the true plaintiff in the suit, while using the name of the Broadway & Seventh Avenue. Furthermore, it had the right, having received the check from the comptroller, to place upon the back of the check the name of the Broadway & Seventh Avenue Company. Therefore, when Receiver Hedges placed or caused to be placed upon the back of the check the indorsement:

"Pay to the American Exchange National Bank. Broadway & Seventh Avenue Railroad Company. Job E. Hedges. New York Railways Company, by J. C. Campbell, Treasurer, for Receiver"

—he exercised his right under the lease to act for and in the name of the lessor. As contended by his counsel, if Hedges, as receiver of the New York Railways Company, had desired to pursue his strict rights, he could have gone to the city, received the check, receipted for it in the name of the Broadway & Seventh Avenue, indorsed it, and collected it, and passed it to the credit of the New York Railways, all under the provisions of the lease.

[6] It is contended, however, that the above-described power, being part of the lease, is no longer in force as regards the receiver, inasmuch as he has not affirmed the lease. But this power was given the lessee for the very purpose of protecting it in carrying out the objects and intent of this indenture. It was a power coupled with an interest, and is not revocable, and must be in the New York Railway Company, no matter what the situation is as to the lease itself, until it has fulfilled its purpose. Hutchins v. Hebbard, 34 N. Y. 24; Pacific Coast Co. v. Anderson, 107 Fed. 973, 47 C. C. A. 106.

[7] As to the Sixth Avenue Company and the Christopher & Tenth Street Railroad Company refunds: The effect of the stipulations is to give this fund the same status as if paid by the city to this court. No rights have been changed. What has occurred is a sort of informal interpleader, with the fund deposited in court to await the result of the interpleader. 4 Pomeroy, Equity Jurisprudence (4th Ed.) § 1323; Chamberlain v. Almy, 3 Misc. Rep. 555, 23 N. Y. Supp. 316; Sherman v. Partridge, 4 Duer (N. Y.) 646; Dyas v. Dyas, 231 Ill. 367, 83 N. E. 229. If the receiver of the New York Railways Company was entitled to collect the refunds from the city, the rights of the lessor companies would not have been enlarged, if they have obtained actual possession of the checks. Horn v. Pere Marquette R. R. Co. (C. C.) 151 Fed. 626.

[8] There remains but one further question necessary to mention. Since the appointment the receiver has continued to operate the lines of these lessor companies, but the court has extended the time for the receiver to elect whether or not to adopt the leases of the lessor companies. See order dated October 28, 1921. No request has been made by any of the above-mentioned lessor companies for a return of their property. The result is that the operation by the receiver of the lines of the lessor companies is for the account of the lessor companies or as the court may find, according as the equities may appear. See opinion of District Court, per Mayer, J., In re Claims of the Eighth and Ninth Avenue Companies for Rent, 282 Fed. 293, filed June 7, 1920.

What the lessor companies have is a claim for rent against the New York Railways Company. This cannot be determined nor enforced in this way; i. e., by collecting it out of a chose in action of the New York Railways Company. Such an effort would have been futile prior to the receivership. It is, if anything, less possible now. What the proposition comes down to is that it is sought to obtain a specific fund on account of the payment in whole or in part of a general claim. In brief, there is no basis as matter of law for a counterclaim.

[9] *The Claim of the Farmers' Loan & Trust Company as Trustee.* —It will not be profitable to extract for quotation the details of the mortgage or of the written data necessarily referred to in considering the "note," quoted fully in the master's report. With all that the master says I fully agree: but, when all the arguments have been advanced and considered, the principle of Noyes v. First National Bank of New York, 180 App. Div. 162, 167 N. Y. Supp. 288, affirmed on opinion below 224 N. Y. 542, 120 N. E. 870, stands as an insuperable barrier against the claim of the trustee. See, also, In the Matter of Interborough Consolidated Corporation, 277 Fed. 455, opinion of District Court for the Southern District of New York, filed December 23, 1921.

The master's report is in all respects confirmed, and the various exceptions overruled.

---

⬩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes