### NATIONAL OIL TRANSPORT CO., Inc., v. UNITED STATES et al.

(District Court, E. D. Louisiana.    February 2, 1927.)

No. 16513.

**1. Admiralty ⚖=1—Admiralty court acts on equitable principles and administers highest form of equity.**

A court of admiralty in this country, as in England, within the scope of its powers, acts on equitable principles and administers the highest form of equity.

**2. Shipping ⚖=24—Corporation's transfer of subsidiary's stock for barge acquired from government under conditional sales contract will be carefully scrutinized on libel against government for loss of barge.**

Public justice *held* to require that validity of acts of corporation in shifting, transferring, and exchanging, or attempting to do so, of shares of stock of its subsidiaries for barges acquired by it from government under conditional sales contracts, be carefully scrutinized when advanced to support subsidiary corporation's claim of ownership of barge on libel against United States for loss of barge.

**3. Corporations ⚖=1—"Corporation" is distinct, legal entity, and mere identity of stockholders does not merge corporations.**

A "corporation" is a distinct, legal entity, apart from individuals composing it, and mere identity of stockholders does not merge one or more corporations into one nor destroy their individual independence nor make the contract of one binding or beneficial to the other.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Corporation.]

**4. Shipping ⚖=19—On libel for loss of barge conditionally sold to libelant's parent corporation, burden held on libelant to prove legal or equitable interest in property.**

On libel by subsidiary corporation against the United States for loss of barge conditionally sold by government through United States Shipping Board and the Emergency Fleet Corporation to parent corporation, burden *held* on libelant to show by fair preponderance of evidence that it had title to barge, or that it was beneficial owner of, or had beneficial interest in, barge and that the claim was fairly presented and all necessary parties impleaded.

**5. Shipping ⊗⟶19—Possession and operation of barge by subsidiary of corporation to which it was conditionally sold held insufficient to prove subsidiary was assignee of parent.**

Possession and operation of barge by subsidiary of corporation to which it was sold by government through United States Shipping Board Emergency Fleet Corporation does not prove that libelant is assignee of owner, so as to be entitled to sue in admiralty for loss of barge.

**6. Shipping ⊗⟶19—Registry of vessel is no evidence of ownership and change of papers is not necessary to vest title in purchaser.**

Registry of vessel only regulates the national character of vessel and does not show ownership, and change of papers is not necessary to vest title in her purchaser, and is not even prima facie evidence of party named therein as owner.

**7. Shipping ⊗⟶19—Resolutions of corporate conditional buyer of barge and of its subsidiary, showing intent to transfer barge to subsidiary in future, held insufficient to show that subsidiary was beneficial owner.**

Where government sold barge to a corporation under conditional sale contract providing that buyer should not convey title or subject barge to execution for its debts before performance of contract, *held*, that resolutions of subsidiary corporation in name of which barge was registered, declaratory of intent to acquire title to barge by some future acts or instruments, and resolutions of buyer contemplating doing of certain acts in future as conditions precedent to transfer of title, did not show that subsidiary was beneficial owner of barge, entitled to maintain libel against government for its loss.

In Admiralty. Libel by the National Oil Transport Company, Inc., against the United States, in which respondent impleaded W. G. Coyle & Co., Inc. Libel dismissed.

Eugie V. Parham, of New Orleans, La., and Bigham, Englar & Jones, of New York City (T. Catesby Jones and James W. Ryan, both of New York City, of counsel), for libelant.

E. F. Henriques, Sp. Asst. U. S. Atty., of New Orleans, La.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (W. H. McGrann, of New York City, and Lemle, Moreno & Lemle, of New Orleans, La., of counsel), for W. G. Coyle & Co., Inc.

BURNS, District Judge. Libelant, the National Oil Transport Company, Inc., a Maine corporation, as owner, prays for recovery of the full value of the oil barge Barugo from the United States, as owner of the tug Barryton. The tug and tow had left Galveston, Tex., September 18, 1920, bound for Tampico, Mexico, and were stranded on September 20th at or near Laguna de Madre, on the Mexican coast, about 100 miles north of

Tampico, some 30 miles west of a correct course, as a result of which the Barugo became a total loss.

Libelant contends that the stranding resulted from the unseaworthiness of the tug which was not equipped with proper and suitable nautical instruments to make observations, was not properly manned, and was negligently operated.

The respondent United States denies liability for the alleged negligence, specially denies the right of libelant to sue as owner of the lost barge, and impleads W. G. Coyle and Company, Inc., of New Orleans, under the fifty-sixth admiralty rule, claiming that the latter had assumed all liability as ship's husband for the tug Barryton under its managing and operating agreement with the United States Shipping Board Emergency Fleet Corporation, an agency of the government, dated February 3, 1921, by which it was bound to equip, man, and otherwise keep the tug seaworthy; that this operating agent had made the charter party with libelant for two towage trips, including that on which the Barugo was lost, and should therefore stand in judgment in the place of its principal.

The Coyle Company filed answers, generally denying negligence, and specially denying any liability arising either out of the charter party or out of its managing and operating agreement with the Shipping Board. It also denied specially the right of libelant to sue or stand in judgment as owner.

In view of the voluminous record now finally submitted, it seems unfortunate that the issue of libelant's ownership was not disposed of in limine litis. An effort was made to do so upon a joint rule filed by respondents in the third year (1923) of the pendency of this suit before the then District Judge (Hon. Rufus E. Foster), but sufficient evidence upon that point seems not to have been available then, and the rule was dismissed.

The oil barge Barugo was included with four other hulls, together with the boilers, fittings, etc., intended for their completion, which were conditionally agreed to be sold by the government for $55,000 each through the agency of the United States Shipping Board and the Emergency Fleet Corporation under a contract dated April 9, 1920, to the National Oil Company of New Jersey (not the National Oil Transport Company of Maine, libelant herein). By this agreement of conditional sale it was expressly stipulated that title to said hulls, boilers, fittings, etc., should remain in the vendor, until the same should be completed, documented, and until the buyer

should have executed the mortgages and notes stipulated for therein.

The National Oil Company of New Jersey proceeded with the completion of these hulls through the National Shipbuilding Company of Texas, a corporation referred to as one of its subsidiaries, owned and controlled by substantially the same shareholders, directors, and officers as itself. When the oil barge Barugo was completed, on or about August 16, 1920, one Charles Tutschulte made registry thereof with the collector of customs at Beaumont, Tex., upon his oath that the National Oil Transport Company of Maine was the sole owner. This corporation was also a similar subsidiary of the National Oil Company of New Jersey. The assistant collector of customs, being deceived by Tutschulte's oath, issued the certificate of registry in error, not noticing the discrepancy in the names of the two companies; i. e., the name "National Oil Company," in the copy of the agreement of sale of April 9, 1920, exhibited to him, and the name "National Oil Transport Company" in Tutschulte's oath. This Mr. Tutschulte in Texas was the attorney in fact for the National Oil Transport Company, Inc., of Maine, and also general manager of the National Shipbuilding Company. He testified that in doing so he acted on instructions from the New York office. Other evidence shows that all of these companies were directed from one office in the Woolworth Building in New York City.

The Barugo was then put in commission for voyages to Mexico and return, although no title, such as the agreement of conditional sale contemplated, or any other, had passed from the United States. On September 15, 1920, the National Oil Company entered into a charter party for the hire of the tug Barryton with W. G. Coyle & Co., Inc., as managing and operating agent of the Fleet Corporation, stipulating for two trips, totaling about 25 days, to be employed in towing the ferris type barge Barugo and/or another, called the Pyramus, between New Orleans, La., and/or Galveston, Tex., and Tampico, Mexico. This contract or charter party for the tug was put in the name of the "National Oil Company, for National Oil Transport Company, a corporation of Maine." It was under this charter party that the tug and tow began the voyage on September 18, 1920, that ended in the stranding and loss on September 20th.

Beyond the use of libelant's name in this contract, there was nothing at this time to indicate that the National Oil Transport Company had or claimed ownership of the Barugo, except the registry made under the circumstances hereinabove described. The insurance on the Barugo had been negotiated by and taken out in the name of the National Oil Company as owner, with the necessary clause in favor of its vendor to cover its interest as it might appear.

Subsequent to the loss, the National Oil Company negotiated for payment from the underwriters of the total loss. Under date of December 16, 1920, its president had made the oath required in support of its proof of claim and swore that the National Oil Company of New Jersey was the owner. While these insurance claims were pending, the National Oil Company, through its president, on January 28, 1921, executed the mortgage as stipulated for in the agreement of conditional sale to be effective nunc pro tunc as of date August 16, 1920, the date on which the Barugo had been completed and put in commission, thus antedating the loss. In this act of mortgage, the National Oil Company stipulated not to "make any sale or other transfer of the vessel or any interest therein without the written consent of the mortgagee first obtained."

Subsequently, on or about January 30, 1922, the National Oil Company collected the insurance, which was for the full insured value of the Barugo, and which was far in excess of the amount of the purchase price represented by the mortgage. At or about this time the mortgage was paid. Nowhere in any of these transactions did the libelant, National Oil Transport Company of Maine, appear or claim any right, title, or interest therein, notwithstanding this suit had been filed on March 21, 1921, in its name, as owner, praying for recovery of the full value.

Upon final hearing, the claim to ownership by title seems to have been abandoned, and by oral argument and brief the contention is made in its behalf that it has the right to sue as the "beneficial owner" for its equitable interest as the assignee of the National Oil Company of New Jersey, in support of which the customhouse certificate of registry and the minute books of the National Oil Company of New Jersey and the National Oil Transport Company of Maine were produced, from which a witness, Robert T. Crouch, who described himself as "secretary of the National Oil Company of New Jersey and of certain of its subsidiaries," read into the record the minutes of two meetings held on August 17 and on September 24, 1920, respectively.[1]

---

[1] See note at end of case.

Assuming, arguendo, these resolutions to have been adopted in good faith and for legitimate purposes, it seems conclusive that they were entirely executory; that the first, adopted by the National Oil Transport Company of Maine, which was dated August 17th, one day after the registry of the Barugo had been made at the customhouse, did not accept the mere registry of the vessel as being declaratory of title in its favor, and that it was simply declaratory of an intention to acquire the property described by some future acts or instruments, which the corporation officers were authorized to make, sign and deliver. The second resolution, by the National Oil Company of New Jersey, is likewise merely executory. It contemplates the doing of certain acts and the happening of certain events in futuro as conditions precedent to the ultimate execution thereof, including an actual transfer and delivery of the Barugo, which had then been stranded some four days in a precarious position subject to the total loss which followed.

During the taking of the testimony Secretary Crouch, who was intimately concerned officially with and participated in all the corporate acts relating to the affairs of both companies, was repeatedly called upon by respondents to produce some evidence to show that the government or the Shipping Board or the Emergency Fleet Corporation, as agents of the government, had ever given a written consent to a sale or transfer of title from the National Oil Company to the libelant Transport Company, or to produce some evidence that these executory resolutions had ever been carried out. His replies were peculiarly evasive and equivocal in each instance. He made some statements suggesting that the government's consent might have been obtained verbally; and seemed, finally, to rely entirely upon the customhouse registry of the vessel, accepting the certificate of registry in the name of the National Oil Transport Company as a complete muniment of title in the libelant, binding as such on the government. In no instance did he offer from the records of the company any proof that the officers of the two corporations had ever carried out the several corporate mandates, expressed in the resolutions, "by suitable instruments to effect the intent and purpose thereof," or that the conditions precedent thereto had ever occurred and made such transfer possible. It is but reasonable to conclude that the final loss of the barge prevented the execution of the intention of the parties, since it made actual transfer and delivery impossible.

The libelant, National Oil Transport Company of Maine, was adjudged a bankrupt during the pendency of this suit. It is represented herein by its Trustee. The National Oil Company of New Jersey is not party to this suit. There is testimony in the record that it passed into a receivership, but neither the corporation or the receivers have appeared as plaintiff, nor by intervention or otherwise, notwithstanding its alleged relation to libelant as a parent corporation, owned and controlled by the same people who commenced this suit in the name of libelant. Without assuming to adjudge its status or its rights, since no decree may be rendered herein effecting its interest, I am constrained by the evidence of record to take notice of its absence, in view of its relation to these litigants and the issues herein made.

[1] The respondents contend upon the evidence of record that this National Oil Company avoided appearance here either as libelant or otherwise, because of its indebtedness for large sums of money due the government, growing out of extensive purchases of ships, barges, tugs, and other water craft on credit and out of contracts for the building of ships, etc., whereby any judgment in its favor might be set off by the overwhelming balance due the government under the Act of March 3, 1875 (18 Stat. 481 [Comp. St. § 6407]). However this may be, its absence as party to the record is no less suspicious than the absence of the libelant as party to the negotiations with the government for a settlement under the conditional contract of sale, and those with the insurance companies for the collection of money under the insurance policies. And in this connection it is necessary to remember that a court of admiralty, in this country, as in England, within the scope of its powers, acts upon equitable principles and administers the highest form of equity. Downs v. Wall (C. C. A.) 176 F. 657; Watts v. Camors, 115 U. S. 353, 6 S. Ct. 91, 29 L. Ed. 406, and the cases there cited.

[2] Whatever may have been the purpose or motive of the National Oil Company of New Jersey in the shifting, transferring, and exchanging, or in attempting to do so, of the shares of stock of its several subsidiaries for property acquired by it under conditional sales and terms of credit, public justice demands that the validity of such acts be carefully scrutinized when they are advanced in support of claims for judicial relief under circumstances such as appear in the minutes of the several corporate meetings, the testimony of corporate officers and agents, and in

sundry of the documentary exhibits. Neither the libelant nor any other of the so-called subsidiary companies of the National Oil Company of New Jersey were in privity of contract with the Government.

[3] The legal concept of a corporation is such that, to exist at all, it must exist and act as a distinct, legal entity, apart from the individuals who compose it. Mere identity of stockholders does not merge one or more corporations into one, nor destroy their individual independence, nor make the contract of one either binding on or beneficial to the other. 14 C. J. 51, and cases cited; Pittsburg & Buffalo Co. v. Duncan et al. (C. C. A. 6) 232 F. 584, 587; Central Trust Co. v. Bridges (C. C. A.) 57 F. 753; Martin v. Development Co. of America (C. C. A.) 240 F. 42.

[4, 5] The burden was on the libelant corporation to make proof, by a fair preponderance of evidence, that it had title to the property, for the full value of which the suit was brought. Failing in this, and putting forward a belated claim to a right of action as a beneficial owner, or one with a beneficial interest, which can only mean a partial interest, or incomplete ownership, that claim should have been fairly presented and all necessary parties impleaded. It is no less necessary that this alleged beneficial interest be sustained by a fair preponderance of competent evidence. The fact of possession and operation of the barge does not suffice to prove libelant the assignee of the owner. The fact of its registry at the customhouse in libelant's name tends rather to diminish than augment any presumption that might arise from possession, since this was predicated upon a false and therefore presumably fraudulent oath. Not even a bona fide registry, or one made in good faith, would suffice to prove ownership of a vessel. The authorities all seem conclusively against the contention that a registry or an enrollment is evidence of ownership. Desty, Shipp. and Adm. § 24; 1 Pars. Shipp. and Adm. §§ 47, 48, and 49; 1 Pars. Shipp. and Adm. §§ 41 and 42.

[6] The registry of vessels only regulates the national character of the vessel, and does not furnish evidence of ownership, and a change of papers is not necessary to vest title in her purchaser. It is not even prima facie evidence in favor of the party named therein as owner. Begley v. Morgan, 15 La. 162, 35 Am. Dec. 188; Bradbury v. Johnson, 41 Me. 582, 66 Am. Dec. 264; Ring v. Franklin, 2 New York Super. Ct. 9; United States v. The Amistead, 40 U. S. (15 Pet.) 518, 594, 10 L. Ed. 826.

Under the present law all vessels of the United States are required to be registered by subsection C of the Ship Mortgage Act of 1920 (Comp. St. § 8146kk), which prescribes that no sale, conveyance, or mortgage shall be valid in respect to a vessel, against any person other than the grantor or mortgagor, his heir or devisees, and a person having actual knowledge thereof, until the bill of sale, conveyance, or mortgage is recorded in the office of the collector of customs of the port of documentation of the vessel.

Various arguments are presented on behalf of libelant, contending for a recognition of its alleged status as beneficial owner. Predicated upon the assumption that it has such status, copious citations of authorities are put forward to sustain its alleged right to sue.

[7] My conclusion is that neither the customhouse registry, nor the executory resolutions, lend support to the claim that libelant is a beneficial owner, as an assignee of the National Oil Company, which was itself but a bailee, as of the date of the loss, and had received possession under an agreement that it might purchase the Barugo on the performance of conditions on its part, and could not convey title to it or subject it to execution for its own debts before the performance of the condition on which the agreement to sell is made. See Harkness v. Russell & Co., 118 U. S. 663, 672, 7 S. Ct. 51, 30 L. Ed. 285.

Whatever may have been libelant's relation to the original vendee of the government, out of which some equitable right may have grown, that relationship was not fairly presented, and the extent or measure of its right was not established. From the record I am persuaded that the extent or measure of this right, if any there is, cannot be determined independently of the original vendee, the National Oil Company of New Jersey, which for some undisclosed reason is not before the court.

Accordingly, since there is no necessity for determining liability for the loss of the vessel between the parties to this record, a decree may be entered in favor of respondents, dismissing the libel at libelant's cost.

### NOTE.

"Minutes of the special meeting of the 'board of directors of the National Oil Transport Company, held at Room 1608, Woolworth Building, New York City, on the seventeenth day of August, 1920, at 3:00 p. m.

Present: P. J. Reilly, W. A. Ebsen, F. Straith-Miller.

Mr. P. J. Reilly, president of the company, acted as chairman, and Mr. R. T. Crouch, sec-

retary of the company, acted as secretary, of the meeting. The chairman stated that it had become desirable, in the conduct of the company's business, to open up additional bank accounts in the name of the company in New York and in Galveston, Texas. A full discussion of the matter was had; whereupon, on motion duly made and seconded, it was unanimously

Resolved, that the Irving National Bank New York be designated as a depository of the funds of this company; and it was

Further resolved, that the treasurer or assistant treasurer or other designated representative of the company shall deposit funds with the said bank in the name of this corporation, and that the president or vice president and treasurer or assistant treasurer shall sign and indorse all checks, drafts, notes, or other obligations for the said company; and

Further resolved, that the Texas Bank & Trust Company, Galveston, Texas, be designated as a depository for the funds of this company; and it was

Further resolved, that the local representatives of the company, at Galveston, deposit funds in the said bank in the name of this corporation, and that the district manager at that point shall sign and indorse all checks, drafts, notes, or other obligations for the said company.

The chairman stated further to the meeting that the barges Bolikaw and Barugo were being completed at the yards of the National Shipbuilding Company in Orange, Texas, and that, the barges being required for the general conduct of the business of the company, it was desirable that they be acquired for its use.

He further stated that, upon the issuance by the company of its full-paid nonassessable capital stock in the amount of $70,000 par value for each barge the vessels could be acquired, and upon motion, duly made and seconded, the following resolutions were unanimously adopted:

Resolved, that the board of directors of this company is of the opinion that the barges Barugo and Bolikow are necessary for the business of this company.

Further resolved, that in the judgment of this board of directors the value of said barges Barugo and Bolikow is in excess of the $70,000 par value of capital stock of this company proposed to be issued and delivered by this company against the purchase price of each of the said barges.

Further resolved, that there shall be issued and delivered by this company to or upon the order of the said National Shipbuilding Company $140,000 par value of the capital stock of this company.

Further resolved, that the said $140,000 par value of capital stock of this company shall when issued pursuant to these resolutions be and the same is hereby declared to be full-paid and nonassessable, and not liable to any further calls or assessments whatsoever.

Further resolved, that the proper officers of this company be and they hereby are authorized and directed to execute and deliver any and all necessary and proper documents and to do any and all things proper and requisite to carry out the intent of these resolutions.

The chairman stated further to the meeting

that the Pacific Coast boats Adria, Agron, Agylla, Broxton, and Snoqualmie had been completed at the shipyard in Seattle, Wash., by the National Shipbuilding Company, and it was desirable that they be acquired for the use of this company.

He further stated that, upon the issuance by the company of its full-paid and nonassessable capital stock in the amount of $90,000 par value for each of the vessels, they could be acquired, and upon motion duly made and seconded, the following resolutions were unanimously adopted:

Resolved, that the board of directors of this company is of the opinion that the vessels Adria, Agron, Agylla, Broxton, and Snoqualmie are necessary for the business of this company.

Further resolved, that in the judgment of this board of directors the value of each of said vessels is in excess of $90,000 par value of capital stock of this company, proposed to be issued and delivered by this company against the purchase price of each of the said vessels.

Further resolved, that there shall be issued and delivered by this company, to or upon the order of the said the National shipbuilding Company, $450,000 par value of the capital stock of this company.

Further resolved, that the said $450,000 par value of capital stock of this company shall, when issued pursuant to these resolutions, be and the same is hereby declared to be full-paid and nonassessable, and not liable to any further calls or assessments whatsoever.

Further resolved, that the proper officers of this company be, and they hereby are, authorized and directed to execute and deliver any and all necessary and proper documents and to do any and all things proper and requisite to carry out the intent of these resolutions.

There being no further business to come before the meeting same upon motion duly made and seconded, adjourned.

[Signed] Robert T. Crouch, Secretary.

Minutes of special meeting of the board of directors of the National Oil Company, held at the office of the company, 1608 Woolworth Building, New York, N. Y., on Friday, September 24, 1920, at 3:00 p. m.

Present: Messrs. P. J. Reilly, T. F. Wickham, W. A. Ebsen, F. Straith-Miller.

Absent Messrs. J. F. Penrose, J. N. Reiber, Benjamin Allen, 3d.

Mr. P. J. Reilly, president of the company, presided as chairman, and Mr. R. T. Crouch, secretary of the company, acted as secretary, of the meeting.

There was presented and read to the meeting a call and waiver of notice, which was ordered filed with the minutes.

The president stated to the meeting that it had become desirable to open a bank account in the Irving National Bank in order to facilitate the conduct of the regular business of the company.

Whereupon, on motion duly made and seconded, it was unanimously

Resolved, that the Irving National Bank, New York, be designated as a depository of the funds of this company; and it was further

Resolved, that designated representatives of the corporation shall deposit funds with the said bank in the name of this corporation, and that the president or vice president and the

treasurer or assistant treasurer shall sign and indorse all checks, drafts, notes, or other obligations for the said company.

The president further stated to the meeting that negotiations had been in progress between the representatives of the company and those of the Irving National Bank, under which the bank had agreed, under certain conditions, to make loans to the company, to be secured by the pledge of certain collateral. The president stated that the arrangements suggested by the bank appeared to be satisfactory to the officers of the company, but that they desired to have the authorization of the Board.

Whereupon, on motion duly made and seconded, it was unanimously

Resolved, that the negotiations heretofore in progress between the officers of the company and those of the Irving National Bank be consummated without delay, and that the proper officers of the company be and they hereby are authorized to arrange for a present loan of one hundred and seventy-five thousand dollars ($175,000), and such additional amounts as may from time to time be required upon the pledge by the company of such collateral as may be advisable or required; and it was further

Resolved, that the proper officers of the company be and they hereby are authorized and directed to sign and deliver all necessary and proper documents in order to effectuate the intent of these resolutions.

The chairman stated to the meeting that the vessels Bolikow and Barugo had now been completed by the National Shipbuilding Company of Texas, and that said vessels have, in accordance with the request of the officers of the company, been registered in the name of the National Oil Transport Company as the property of that company, in consideration of the issuance and delivery by the National Oil Transport Company, to or upon the order of the National Shipbuilding Company, of one hundred and forty thousand dollars ($140,000) in par value of the full-paid and nonassessable common capital stock of the National Oil Transport Company, when so received, would be delivered by the National Shipbuilding Company to this company, to be held as collateral security for the indebtedness of said shipbuilding company to this company for moneys loaned or to be loaned to said shipbuilding company.

He also stated that it was supposed that said stock should be purchased by the company from the shipbuilding company, subject to the company's obligations in respect to such bonds under this company's first lien indenture for a sum equal to the indebtedness of the shipbuilding company to this company incurred for advances made in connection with the building of said vessels, and that such stock would be delivered by it to the New York Trust Company as trustee, under the first lien indenture of this company, dated November 1, 1919, to be held by it as collateral security for bonds of this company issued thereunder, and in order that such stock of the transport company should also be held by the trustee of such indenture as collateral for the evidences of indebtedness of the National Shipbuilding Company, delivered or to be delivered to it as collateral security thereunder and pursuant to the terms of said indenture.

Whereupon, on motion duly made and seconded, it was unanimously

Resolved, that this corporation does approve of the transfer and delivery by the National Shipbuilding Company of Texas to the National Oil Transport Company of the vessels Bolikow and Barugo, in consideration of the issuance and delivery to the National Shipbuilding Company of one hundred and forty thousand dollars ($140,000) in par value of the full-paid and nonassessable common capital stock of said transport company.

Further resolved, that the proper officers of this company be and they hereby are authorized and directed to purchase such stock of the transport company from the said shipbuilding company (the purchase of such stock to be subject, however, to the obligations of this company in respect thereto under the provisions of this company's first lien indenture) for a sum equal to the obligation or obligations of said shipbuilding company to this company for advances made in connection with the construction of said vessels, and to be paid upon the payment to this company of such obligation or obligations of the shipbuilding company.

Further resolved, that upon receipt by the officers of this company of the shares of stock of the National Oil Transport Company, issued with respect to said vessels Bolikow and Barugo, that the said stock shall be delivered to the New York Trust Company, trustee, to be held by it as collateral security (1) for the evidences of indebtedness of said shipbuilding company now held or hereafter delivered to it; (2) for the bonds of this company, all as contemplated and provided in section 7 of article 5 of said first lien indenture.

Further resolved, that the proper officers of this company be and they hereby are authorized to take all necessary and proper steps and to execute all necessary and proper instruments to carry into effect the intent and purpose of the foregoing resolutions.

There was further general discussion of corporate matters, but, there being no other business to come before the meeting the same, upon motion duly made and seconded, adjourned.

[Signed] Robert T. Crouch, Secretary.